E filing

FILED

MAR - 4 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF COURT
OAKLAND CALIFORNIA

1  Eugene Terrell
   439 Douglas Avenue
2  Oakland, Ca. 94603

3

4            UNITED STATES DISTRICT COURT

5                      FOR THE

6        NORTHERN DISTRICT OF CALIFORNIA

7

| | |
|---|---|
| 8  Eugene Terrell, | Case No.: **C08-01273** ADR |
| 9  Engineering Theoretical Technologies Research & Development Publications (ETT-R&D Publications) | |
| 10  439 Douglas Avenue, Oakland, Ca. 94603, | MOTION AND NOTICE FOR MANDATORY INJUNCTIVE RELIEF |
| 11       Plaintiff, | Demand: $950 and Medication Costs |
| 12 | |
| 13       vs. | FCRP 56, Calif.Code.Civ.Proc. Section 525 - 534 |
| 14 | 42 U.S.C. 1983, US Constitutional 14th Amendment Rights |
| 15  State of California Office of the Attorney General Edmund G. Brown Jr. | |
| 16  Office of the District Attorney; 1225 Fallon Street, Room 900, | California CIVIL CODE SECTION - 52.1. (a) and (b) |
| 17  Oakland, CA 94612 | JURISDICTION; TITLE 28 PART IV CHAPTER 89 Section 1443 (1) (2) |
| 18  Office of the United States Attorney, | |
| 19  Attorney General Michael Mukasey; | VENUE; TITLE 28 PART IV CHAPTER 87 Section 1391 (b)(1), (e)(1) |
| 20  Office of the United States Attorney, 1301 Clay Street, Suite 340S, | |
| 21  Oakland, CA 94612 | Dated this 28th day of February, 2008 |
| 22 | |
| 23       Defendants | Attorney – In Pro Per; Eugene Terrell |
| 24 | 439 Douglas Avenue Oakland, Ca. 94603 |
| 25 | Ph: 510-636-9885 |

Notice is hereby given to all parties that on or before 31st of March 2008, or as soon as the Motion for MANDATORY INJUNCTIVE RELIEF can heard, {brought before the Justices of the US District Court for the Northern District of California} in which the Plaintiff seeks an Order for relief.

Note; It is behooving to mention to all Parties and the Court;

1) It has been more than 60 days since my initial request for assistance, and I (the Plaintiff) has not received any response from Alameda County Department of Social Services.

2) Welfare Employment/Case Worker, Falsified Medical Diagnosis – claiming that Plaintiff only has Indigestion, which was entered in the Plaintiff's welfare case records.

# INTRODUCTION

I am currently under a Doctor's care at Highland Hospital, in which I am awaiting an appointment for an Exploratory Examination regarding my Ulcer. In fact, I have had an Ulcer for more than 25 years. However, I was diagnosed in Toronto Canada, with a Perforated Ulcer in 1982.

Nevertheless, since 1985, I have been treated at Kaiser Hospital, Fairmont Hospital, and Highland Hospital, for my Ulcer and its associated Pain. In fact, at Fairmont Hospital I was given a Prescription of Valiums to ease my Ulcer pain.

Moreover, while 2 Doctors have agreed with my use of Marijuana as an alternative Pain Medication; there are, nonetheless, several just and rational reasons for seeking Natural Medicines. Yet, I am being denied the assistance the Department of Social Services is providing to other Welfare Clients, who also use alternative medicines for pain relief.

# PARTIES

1) Plaintiff; Eugene Terrell, owner and Principle Director of Research and Development, since 1994, of Engineering Theoretical Technologies - Research and Development Publications.

2) Defendant(s);

   a. United States Government

   b. State of California

   c. California Department of Social Services

      1) John A. Wagner, Director    .

      2) Ms. Hill, Director Eastmont Division

      3) Ms. Thorgkham (VB35), Cash Aid Worker

      4) Ms. Trujillo (253), Employment Consultant

# LEGAL BACKGROUNG

"The Equal Protection Clause of the 14th amendment of the U.S. Constitution prohibits states from denying any person within its jurisdiction the equal protection of the laws.
See U.S. Const. amend. XIV.

In other words, the laws of a state must treat an individual in the same manner as others in similar conditions and circumstances. A violation would occur, for example, if a state prohibited an individual from entering into an employment contract because he or she was a member of a particular race. The equal protection clause is not intended to provide "equality" among individuals or classes but only "equal application" of the laws. The result, therefore, of a law is not relevant so long as there is no discrimination in its application. By denying states the ability to discriminate, the equal protection clause of the Constitution is crucial to the protection of civil rights. See Civil Rights and Discrimination.

Generally, the question of whether the equal protection clause has been violated arises when a state grants a particular class of individuals the right to engage in activity yet denies other Individuals the same right."

1

## FACTUAL BACKGROUND

2

3  Clearly, it would be an exception if I were the first person to
4  make this request. But I am not! In fact, California Department
5  of Social Services has rendered a Decision favoring several
6  other people (Welfare Clients) who has a Medical Condition that
7  includes pain. In other words, I have asked for assistance
8  regarding this matter, last year, and I have not received any
9  response. And more importantly, in California, I have been
10 receiving treatment for my Ulcer for at least 20 years

11

12 Still, I am wondering why it is that, when I seek assistance
13 from the Department of Social Services, I am continuously
14 denied. Clearly, I am being denied the Rights encompassing the
15 Equal Protection Laws. I have also been denied any information
16 regarding the medical assistance I have requested, and I have
17 been under a Doctors Care for at least a year. Yet, I have not
18 been given any information about Medi-Cal, or Medicare, nor how
19 to apply for any of these services.

20

21 I ask the Court, in a Democracy; 'Why is the information about
22 the Laws and Programs that benefits its Citizens, being
23 concealed?' What is the purpose of the United States
24 Constitution, or telling its Citizens they have any Rights at
25 all?

1

2

## CLAIMS FOR RELIEF

3

### Damages – Pain Medication - Medical Assistance Denial

4

5
2) WELFARE AND INSTITUTIONS CODE SECTION 14000-14029.5/17000-17030.1

6
   a) Medical Marijuana income loss for continued use – $950

7
   b) Monthly Vouchers for continued use Medical Marijuana $\approx$ $500 per Month

8

9
   c) Or the Sum, equaling the cost to acquire the requested Medical Assistance for the Purchase of Pain Medication, as Required by California's Law $\approx$ $950 plus Monthly Vouchers

10

11

12

13

## PRAYER FOR RELIEF

14

15
WHEREFORE, Plaintiff respectfully requests that this Court

16
issues an Order to the California Department of Social Services
to:

17
1) Compensate / Pay the amount of $950, in addition to the

18
   cost associated with the Continued use, to the Plaintiff

19
   for the purchase of a Monthly allotment of an Ounce of

20
   Medical Marijuana.

21
2) And if, upon any finding of Fact that Discrimination is

22
   indeed the prevalent issue. The Plaintiff request that

23
   the Court Penalize the Named Defendants as prescribed by

24
   California CIVIL CODE SECTION - 52.1. (a) and (b), which
   requires each of the Defendants to pay $25,000 to the

25
   Plaintiff.

1

2

## Supplemental – Table of Authority

3

## U.S. Codes / Federal and California State Laws

4

5

6   Sec. 1902. [42 U.S.C. 1396a] (a) A State plan for medical

7   assistance must—

8   (3) Provide for granting an opportunity for a fair hearing

9   before the State agency to any individual whose claim for

    medical assistance under the plan is denied or is not acted upon

10

11  with reasonable promptness;

12

13                          ## Case Law Decisions

14  1) *Conlan v. Bontá* (2002) 102 Cal.App.4th 745 (*Conlan I*)

15  2) Conlan v. Shewry, 131 Cal.App.4th 1354 (2005)

16

17

18

19

20

21

22

23

24

25

# WELFARE AND INSTITUTIONS CODE

## SECTION 14000-14029.5

14000. The purpose of this chapter is to afford to qualifying individuals health care and related remedial or preventive services, including related social services which are necessary for those receiving health care under this chapter. The intent of the Legislature is to provide, to the extent practicable, through the provisions of this chapter, for health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security.

## SECTION 17000-17030.1

17000. Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

17000.51. (a) Notwithstanding the decision in Caulk v. Superior Court, CO15355, June 27, 1997, a county's discretion granted pursuant to Section 17000.5 to include, as part of a general assistance aid grant, in-kind aid with a monthly actuarial value of up to forty dollars ($40) per month of medical care, was not intended, and shall not be construed, to do any of the following:

1    (1) Satisfy, in whole or in part, the duty of a county or a
2    city or county to provide health care services to indigent and
3    dependent poor persons under Section 17000. (2) Permit a county
4    or a city and county to cease providing health care services
5    under Section 17000. (3) Affect the eligibility of indigent and
6    dependent poor persons for health care services under Section
     17000.

7

8

9    State of California; CIVIL CODE SECTION 43-53

     Section 52.1
10

11

12    (a) If a person or persons, whether or not acting under color
13    of law, interferes by threats, intimidation, or coercion, or
14    attempts to interfere by threats, intimidation, or coercion,
15    with the exercise or enjoyment by any individual or individuals
16    of rights secured by the Constitution or laws of the United
17    States, or of the rights secured by the Constitution or laws of
18    this state, the Attorney General, or any district attorney or
19    city attorney may bring a civil action for injunctive and other
20    appropriate equitable relief in the name of the people of the
21    State of California, in order to protect the peaceable exercise
22    or enjoyment of the right or rights secured. An action brought
23    by the Attorney General, any district attorney, or any city
24    attorney may also seek a civil penalty of twenty-five thousand
25    dollars ($25,000). If this civil penalty is requested, it shall

1  be assessed individually against each person who is determined
2  to have violated this section and the penalty shall be
3  awarded to each individual whose rights under this section are
4  determined to have been violated.

5

6

7  (b) Any individual whose exercise or enjoyment of rights
8  secured by the Constitution or laws of the United States, or of
9  rights secured by the Constitution or laws of this state, has
10  been interfered with, or attempted to be interfered with, as
11  described in subdivision (a), may institute and prosecute in his
12  or her own name and on his or her own behalf a civil action for
13  damages, including, but not limited to, damages under Section
14  52, injunctive relief, and other appropriate equitable relief to
15  protect the peaceable exercise or enjoyment of the right or
16  rights secured.

17

18

19

20

21

22

23

24

25

# Evidence Section

Alameda County Social Services Agency
Director of Eastmont Town Center
Eastmont Town Center
6955 Foothill Blvd Suite 100
Oakland, Ca. 94605


Ms. Hill:


I am seeking financial assistance for the purchase of Pain Medication, <u>Medical Marijuana</u>, to relieve the discomforts of an Ulcer, which I have had to endure for more than 30 years. Currently, I am under a Doctors care at Highland Hospital, for several Medical reasons, which includes treatment for my Ulcer.

However, as with most things, because I am a Research Scientist, whose primary areas research deals with Biology, Chemistry, Mathematics/Computer Science, and Physics. I have sought only the Legal remedies, with the advice of 2 Doctors that agreed with an Alternative Medication to relieve the pain associated with my Ulcer. In other words, <u>I am a Medical Marijuana Patient</u>... <u>But I cannot afford the out of pocket cost to purchase an ounce of the medication, which is the required monthly use, to ease the pain from my Ulcer. And so far, I have spent more than $800 of my GA allotment, beginning in April 2007, to pay for the Medication.</u> In fact, I was prescribed medication at Highland Hospital, for an infection, last year, but I could not afford to pay the cost. And, at that time, I did not know that the law required the California Department of Social Services to assist the Indigent in the payment for medication.

And while I am well aware that because of my Race, or Color of my Skin, the required assistance will more than likely be denied. I am attaching a copy of the Court Decision, along with my request for a Voucher to pay for the Cost of my Pain Medication.

Oh yes! Please, do not challenge my mental or intellectual mind set, because if you choose too, I would suggest that you first read the manuscripts posted on the site of the IETF (Internet Engineering Task Force). In other words, my abilities, while not recognized or accepted in this country, because of my Race, are nonetheless, known all over the world. In other words, before you question my integrity, you should know I am the author of an Alternate Mathematical Field, a Binary Assembler Programming Language, and a New Internet Protocol Addressing Specification.

1

In a word, I am a Researcher, accomplished in Mathematics, Physics, Electro-Chemistry, Computer Science, Networking, Network and Engineering, which includes a New Internet Telecommunications Specification that allows the used of the Internet as thoroughfare for every form of Communications.

1. http://www.ietf.org/internet-drafts/draft-terrell-logic-analy-bin-ip-spec-ipv7-ipv8-10.txt
(Foundational Theory for the New IPtX family IP Addressing Specification, and the Binary Enumeration error discovery after the correction.)

2. http://www.ietf.org/internet-drafts/draft-terrell-simple-proof-support-logic-analy-bin-02.txt
(The 2nd proof for the existence of another Binary System, resulting from the Error Correction.)

3. http://www.ietf.org/internet-drafts/draft-terrell-visual-change-redefining-role-ipv6-01.pdf
(Argument against the Machine dependant IPv6 deployment.)

4. http://www.ietf.org/internet-drafts/draft-terrell-schem-desgn-ipt1-ipt2-cmput-tel-numb-02.pdf
(The foundation of the New IPtX Addressing Spec compared to the Telephone Numbering System.)

5. http://www.ietf.org/internet-drafts/draft-terrell-internet-protocol-t1-t2-ad-sp-06.pdf
(The IPtX Addressing Specification Address Space / IP Address Allocation Table; establishes the visual perspective that actually represents Networking Schematic Networking the entire World on Paper. )

6. http://www.ietf.org/internet-drafts/draft-terrell-iptx-spec-def-cidr-ach-net-descrip-01.pdf
(Re-Defines CIDR) {Classes Inter-Domain Routing Architecture} and introduces the Network Descriptor for the IPtX Addressing Standard)

7. http://www.ietf.org/internet-drafts/draft-terrell-math-quant-new-para-redefi-bin-math-04.pdf
(The 3rd Proof for the New Binary System, correcting the error in Binary Enumeration.)

8. http://www.ietf.org/internet-drafts/draft-terrell-gwebs-vs-ieps-00.pdf
(Defining the GWEBS – The Global Wide Emergency Broadcast System)

9. http://www.ietf.org/internet-drafts/draft-terrell-iptx-dhcp-req-iptx-ip-add-spec-00.pdf
(The development of the DHCP {Dynamic Host Configuration Protocol} for the IPTX IPSpec)

10. http://www.ietf.org/internet-drafts/draft-terrell-iptx-dns-req-iptx-ip-add-spec-03.pdf
 (The development of the DNS {Domain Naming Specification} the for IPTX IPSpec)

11. http://www.ietf.org/internet-drafts/draft-terrell-math-quant -ternary-logic-of-binary-sys-12.pdf
(Derived the Binary System from the proof of "Fermat's Last Theorem", and Developed the Ternary Logic for the Binary System)

12. http://www.ietf.org/internet-drafts/draft-terrell-cidr-net-descrpt-expands-iptx-add-spc-21.pdf
(An application of Quantum Scale Theory, the $2^X : 1$ Compression Ratio, the Expansion derived from the 'CIDR Network Descriptor, and the Mathematics of Quantification provided the foundation for the development of the "Intelligent Quantum Tunneling Worm Protocol"; A Routable Mathematical Exponential Expression, Backend IP Addressing Protocol that provides an (nearly) Unlimited IP Address Space using the Compression Ratio $2^X : 1$.)

13. http://www.ietf.org/internet-drafts/draft-terrell-iptx-mx-dns-specification-04.pdf
(The development of the IPtX / IPtX-MX DNS {Domain Name Service} for IPTX IP Addressing Spec)

14. http://www.ietf.org/internet-drafts/draft-terrell-iptx-mx-dhcp-specification-02.pdf
 (The development of the IPtX / IPtX-MX DHCP {Dynamic Host Configuration Protocol } for IPTX IP Addressing Spec)

Note: Of these Drafts, only 11 thru 14 are Current; the remaining has expired at www.ietf.org Web Site. However, you can still find copies posted at Web Sites all over the World. {Suggestion; Perform Internet search using "Yahoo" or "Google", Key word: "ETT-R&D Publications"}.

3

## Pure Mathematical Research:

1. **The Proof of Fermat's Last Theorem; The Revolution in Mathematical Thought {Nov 1979}**
Outlines the significance of the need for a thorough understanding of the Concept of
Quantification and the Concept of the Common Coefficient. These principles, as well many others,
were found to maintain an unyielding importance in the Logical Analysis of Exponential
Equations in Number Theory.

2. **The Rudiments of Finite Algebra; The Results of Quantification {July 1983}**
Demonstrates the use of the Exponent in Logical Analysis, not only of the Pure Arithmetic
Functions of Number Theory, but Pure Logic as well. Where the Exponent was utilized in the
Logical Expansion of the underlining concepts of Set Theory and the Field Postulates. The results
yield another Distributive Property that is Conditional, which supports the existence of a Finite
Field (i.e. Distributive Law for Exponential Functions) and emphasized the possibility of an
Alternate View of the Entire Mathematical field.

3. **The Rudiments of Finite Geometry; The Results of Quantification {June 2003}**
Building upon the preceding works from which the Mathematics of Quantification was derived.
Where by it was logically concluded that there existed only 2 mathematical operations; Addition
and Subtraction. In other words, the objectives this treatise maintained, which was derived from
the foundation of the Mathematics of Quantification; involves not only the clarification of the
misconceptions concerning Euclid's Fifth Postulate, and the logical foundation of his work, or the
existence of 'Infinity in a Closed Bound Finite Space'. But, the logical derivation of the
Foundational Principles that are consistence with the foundation presented by Euclid, which would
establish the logical format for the Unification of all the Geometries presently existing.

4. **The Rudiments of Finite Trigonometry; The Results of Quantification {Work in Progress 2004}**
The development of the concepts for Finite Trigonometry from the combined foundations derived
from numbers 3 and 5, and the Mathematics of Quantification.

5. **The Mathematics of Quantification and the Metamorphosis of $\pi : \tau$ {Work in Progress 2004}**
The logical derivation of the exact relationship between the Circumference and the Diameter of
the Circle, which defines the measurement of the exact length of the Circle's Circumference, $\tau$
when the Radius is equal to '1': The Realization of Archimedes' failure.

6. **Squaring the Circle? First! What is the Circle's Area? {January 2005}**
The Rhind Papyrus Tale, and the 10,000-year-old quest involving "███████████";
Derivation of the equation resolving the Area of the Circle. An illusion perplexing the Sight and
Mind of the greatest mathematicians for about 10,000 years, which maintains an elementary
algebraic solution: $(\pi r \div 2)^2 =$ Area of Circle.

## Theoretical Physics Research:

1. **The Mathematics of Quantification & The Rudiments of Finite Physics**
The Analysis of Newton's Laws of Motion...the Graviton' {Work in Progress 2004}
Through the use of Finite Algebra, Geometry, Trigonometry, and # 5, investigation of the
Laws of Classical Physics were found to be erroneous. This allowed the presentation of the
initial work, which correct the flaws in Classical Physics, and establishes the foundation upon
which there exist the possibility of a Grand Unified Field Theory for the Natural Sciences

Just Think... Because my work challenges the Ruling Authority, my work is not accepted, I am not cannot get paid, nor am I allowed to make any Money. Any yet, proving Sir Isaacs Newton's Laws of Motion are wrong, for a White Man, this would garner him a Nobel Prize! But, for me, I have been threatened, and nearly killed.

<u>By the way, at Fairmount Hospital, I was prescribed "Tagamet and Valiums" to treat and relieve the pain of my Ulcer</u>. ***

Needless to say, the tactics employed, along with being labeled a Murder, an Armed and Extremely Dangerous Criminal, and a Terrorist, designed by the Racist regime to prevent any challenge to their Authority... While I have been denied Civil and Constitutional Rights, and the Rights defined by the Declaration of Independence... Don't work!

In other words, I have qualified myself, intellectually, to speak the entire World, and tell the story of my life in the United States of America – specifically, regarding the Lie about their claims of having a Democracy. That is, I have voiced my complaint to several Governments and the United Nations. In a word, by now everyone knows, in 1979, I designed a High Emitting Thermo-Neutron Bomb for United States Department of Energy and FBI, a work for which I was never paid, nearly killed, and to this day, still plagues my life.

Oh! Before I forget... Please read the Evidence Section, and note, while my work was announced as being a "breath-taking Internet-Draft", expounding "Revolutionary views about the DNS". I was not however, chosen to speak at the '2007 DNS World Conference'.

I wonder...

Why do I, for the past 40 plus years, always have to worry about some Whiteman, or one of his political House Servants, trying to kill me, when the only offense I've committed violates his claim, that Skin Pigment is the attribute defining his Intellectual Superiority?

In any case, at least now, none of you can say you don't know why all of this has happened to me. Especially since, I am not the FIRST... However, I can say, perhaps I am the first who lived to tell the story...


I'll see you in Federal Court... this time.

5

Sincerely,

_____

Eugene Terrell
Case Number: B112232
SSN: 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
3312 64th Avenue Place
Oakland, CA. 94605
eugeneterrell@yahoo.com
Ph: 510-636-9885

cc Ms. B. Thongkham {VB35}, and Ms. A Trujillo {V235}

Date: December 20, 2007

**WELFARE AND INSTITUTIONS CODE**
**SECTION 14000-14029.5**

14000. The purpose of this chapter is to afford to qualifying individuals health care and related remedial or preventive services, including related social services which are necessary for those receiving health care under this chapter. The intent of the Legislature is to provide, to the extent practicable, through the provisions of this chapter, for health care for those aged and other persons, including family persons who lack sufficient annual income to meet the costs of health care, and whose other assets are so limited that their application toward the costs of such care would jeopardize the person or family's future minimum self-maintenance and security.

**WELFARE AND INSTITUTIONS CODE**
**SECTION 17000-17030.1**

17000. Every county and every city and county shall relieve and support all incompetent, poor, indigent persons, and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported and relieved by their relatives or friends, by their own means, or by state hospitals or other state or private institutions.

17000.51. (a) Notwithstanding the decision in Caulk v. Superior Court, CO15355, June 27, 1997, a county's discretion granted pursuant to Section 17000.5 to include, as part of a general assistance aid grant, in-kind aid with a monthly actuarial value of up to forty dollars ($40) per month of medical care, was not intended, and shall not be construed, to do any of the following: (1) Satisfy, in whole or in part, the duty of a county or a city or county to provide health care services to indigent and dependent poor persons under Section 17000. (2) Permit a county or a city and county to cease providing health care services under Section 17000. (3) Affect the eligibility of indigent and dependent poor persons for health care services under Section 17000.

**Note: I am too young to receive Medi-Cal; Date of Birth – May 9th, 1951. Still, I would not be in this predicament if Racism did not exist in the United States!**

7

# DPA Wins Fight on Medical Marijuana Expenses in California

**Friday, September 29, 2006**

DPA's Office of Legal Affairs achieved a victory for California patients this week after a protracted legal battle. As a result of <u>a court decision on September 25,</u> indigent medical marijuana patients in California who receive public assistance benefits through the Department of Health Services may qualify for reimbursement of the cost of their medicine.

The case centered around Sylvia Price, who uses medical marijuana to alleviate severe, constant pain associated with lupus, a seizure disorder, reflux sympathetic dystrophy, and osteoporosis. Ms. Price sought and received reimbursements for the cost of her medical marijuana under Lake County's public assistance program, which took into account Ms. Price's out-of-pocket expenditures for medical marijuana when determining what level of assistance she should receive.

Then, three years ago, Lake County suddenly stopped reimbursing Ms. Price, claiming that federal law prohibited it from doing so.  DPA took on her case, and after three administrative hearings and one appeal, the administrative court this week finally resolved the issue.

The <u>decision</u>, written on behalf of the California Department of Health and Human Services (DHS), made clear that DHS policy is to permit reimbursement of medical marijuana claims for patients who receive public assistance from that agency. DHS's administrative court also made clear that federal marijuana laws do not prevent the state agency from honoring California's medical marijuana law and enforcing department policy.

The decision held, in relevant part: "The disparity between federal law treating marijuana as a controlled and illegal substance and California's Compassionate Use Act of 1996 and the Medical Marijuana Program Act has been decided and it is now established that DHS regards medical marijuana used consistent with the Compassionate Use Act of 1996 and the Medical Marijuana Program Act as a bona fide medical expense."

This means that medical marijuana patients receiving public assistance benefits through DHS may qualify for reimbursement of reasonable, documented expenses incurred in obtaining their physician-recommended marijuana.

As for Ms. Price, she in all likelihood will be retroactively reimbursed for several thousand dollars of past out-of-pocket costs in purchasing medical marijuana.

8

# Evidence Section

Filed 8/15/05

## CERTIFIED FOR PUBLICATION

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA
### FIRST APPELLATE DISTRICT
### DIVISION THREE

| | |
|---|---|
| KEVIN CONLAN et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> SANDRA SHEWRY, as Director, etc., et al., <br><br> Defendants and Appellants. | A106278 <br><br> (City & County of San Francisco Super. Ct. No. 987697) |

Nearly three years ago, this court interpreted state and federal law governing Medi-Cal, California's implementation of Medicaid, to require that beneficiaries receive reimbursement for covered medical expenses incurred during the three-month period before they apply for assistance (the retroactivity period). (*Conlan v. Bontá* (2002) 102 Cal.App.4th 745 (*Conlan I*).) In order to comply with federal law, we held the State Department of Health Services (DHS or the Department) must provide a means by which those who incur covered expenses during the retroactivity period may either obtain reimbursement directly from the Department or compel their providers to obtain reimbursement on their behalf. (*Id.* at pp. 753-754.) Although acknowledging that "[t]he manner in which the Department chooses to meet its obligations is within the discretion of the Department," the trial court was directed to "issue a writ of mandate pursuant to Code of Civil Procedure section 1085 directing the Department to adopt and implement procedures consistent with this opinion to ensure that Medi-Cal recipients entitled to reimbursement for covered services obtained during the retroactivity period are promptly reimbursed." (*Conlan I, supra*, at p. 764.)

Almost three years have elapsed since *Conlan I* was decided. During this period, the Legislature has amended the governing statute to incorporate the substance and

1

undoubtedly to facilitate the implementation of that decision. Yet, so far as the record now before this court indicates, to date the Department has not begun to implement the decision. To the contrary, the Department has resisted petitioners' efforts to enforce compliance, pleading poverty and reasserting contentions that were rejected in *Conlan I.* The trial court, displaying considerable patience over an extended course of hearings, ultimately entertained a motion by the Department to approve a proposed plan and a notice that it intended to send to Medi-Cal recipients informing them of the new procedure. The trial court found the Department's plan, as best it could be understood, inadequate in several respects, and entered an order specifying changes in the notice required to comply with the decision in *Conlan I.* Rather than make those changes or seek immediate writ review, the Department chose to appeal from the nonappealable order, which has resulted in an additional year of delay. In the interest of avoiding further prolongation of these proceedings, we treat the appeal as a petition for a writ of mandate and review each of the rulings to which the Department objects. With two qualifications, we conclude the trial court properly interpreted *Conlan I* and provided appropriate amplification with respect to specifics that were not addressed in the original appeal.

## BACKGROUND

### Statutory framework

"Title XIX of the Social Security Act (42 U.S.C. §§ 1396-1396s), commonly known as Medicaid, is a cooperative federal-state program designed to provide medical assistance to individuals with insufficient income and resources to meet the costs of necessary medical care. (42 U.S.C. § 1396.) Medi-Cal is the state implementation of the federal Medicaid program, and is administered by the Department. (Welf. & Inst. Code,[1] §§ 10721, 14000 et seq.; Cal. Code Regs., tit. 22, § 50004.)" (*Armando D. v. State Dept. of Health Services* (2004) 124 Cal.App.4th 13, 16.) States are not required to

---

[1]    Unless otherwise indicated, all statutory references are to the Welfare and Institutions Code.

2

participate in Medicaid but if a state does participate, it must comply with the federal statutes and regulations governing the programs. (*Wilder v. Virginia Hospital Assn.* (1990) 496 U.S. 498, 502.)

"Among the many requirements of federal law, states that participate in Medicaid must provide qualifying individuals coverage for services received during the three months prior to applying for benefits if the individual was eligible for benefits during that period. (42 U.S.C. § 1396a(a)(34); 42 C.F.R. § 435.914.) This is called the 'retroactivity period.' For a variety of reasons, qualifying individuals often will obtain covered services during that 90-day period. If they pay for those services, they become entitled to prompt reimbursement once they receive their Medi-Cal card and are accepted into the program." (*Conlan I, supra*, 102 Cal.App.4th at p.753.) Although not explicitly the focus of *Conlan I*, Medi-Cal beneficiaries are also entitled to reimbursement of expenses incurred during the period between the submission and approval of their applications (the evaluation period). (§ 14019.3, subd. (a)(1).) The "comparability requirement" incorporated in the Medicaid program mandates that "the medical assistance made available to any individual . . . shall not be less in amount, duration, or scope than the medical assistance made available to" any other individual. (42 U.S.C. § 1396a(a)(10)(B).)[2] This medical assistance includes "payment of part or all of the cost of the [covered] care and services . . . ." (42 U.S.C. § 1396d(a).)

---

[2]  The omitted language in the ellipsis limits the scope of the comparability provision to individuals described in 42 United States Code section 1396a(a)(10)(A), i.e., persons qualifying for assistance under other federal programs who are referred to as the "categorically needy," as distinguished from the "medically needy." The latter "are persons who are unable to pay for medical expenses, but whose income is too large to qualify for aid under other federal financial assistance programs." (*Massachusetts Ass'n of Older Americans v. Sharp* (1st Cir. 1983) 700 F.2d 749, 750.) Pointing to this distinction for the first time, the Department questions this court's interpretation of the comparability provision. Not only does any argument based on the proper interpretation of 42 United States Code section 1396a(a)(10)(B) come too late (see *Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 301 [The " 'decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case' "]), but the distinction does not affect the issues in this litigation. Title 42 United States Code section 1396a(a)(10)(B) requires treating categorically needy Medi-Cal recipients no

3

Prior to *Conlan I*, section 14019.3 provided that Medi-Cal recipients who had paid for medical services for which coverage was available were entitled to reimbursement from their provider after the provider had been reimbursed by the state.[3] In the first appeal, the Department acknowledged that no means existed to compel a recalcitrant provider to seek reimbursement, but contended that the federal "vendor payment principle" prevented the Department from directly reimbursing beneficiaries. *Conlan I* rejected that contention and section 14019.3 subsequently has been amended to explicitly authorize direct payments to beneficiaries.

## Procedural history

### A. Overview

Some months after the decision in *Conlan I* became final, petitioners again requested the trial court to issue a writ of mandamus ordering the Department to implement a system to provide prompt reimbursement to those who had incurred expenses for which they were entitled to reimbursement. The Department opposed that application, offering numerous reasons why it could not comply. Rather than simply issuing a writ in the terms specified in the opinion of this court, the trial court entertained the Department's objections and ultimately ordered the Department to submit a proposed plan that DHS considered sufficient to comply with the directive in *Conlan I*. Without objection, DHS submitted its proposed plan, a motion for its approval, and lengthy

---

less favorably than any other recipient. The Department's failure to ensure reimbursement, as this court held in *Conlan I*, violates this requirement.

[3] When *Conlan I* was decided, section 14019.3 provided that "(a) A beneficiary or any person on behalf of the beneficiary who has paid for health care services otherwise covered by the Medi-Cal program received by the beneficiary shall be entitled to a return *from the provider* of any part of the payment which meets all of the following: [¶] (1) Was rendered during any period prior to the receipt of his or her Medi-Cal card, for which the card authorizes payment under Section 14018 or 14019. [¶] (2) Was reimbursed to the provider by the Medi-Cal program, following all audits and appeals to which the provider is entitled. [¶] (3) Is not payable by a third party under contractual or other legal entitlement. [¶] (4) Was not used to satisfy his or her paid or obligated liability for health care services or to establish eligibility. . . . [¶] (e) The provider shall return any and all payments made by the beneficiary . . . *upon receipt of Medi-Cal payment.*" (Italics added.)

4

argument as to why further or faster compliance was impossible. At the hearing on that motion, the trial court refused to approve the proposed plan, but ordered the Department to submit a proposed notice to Medi-Cal beneficiaries to be sent out as soon as possible to advise those with potential claims of the need to save their receipts. The Department submitted a proposed form of notice predicated on the compliance plan that the court had rejected, accompanied by additional argument as to why it could not comply with the trial court's orders. On March 3, 2004, the trial court issued an order denying without prejudice approval of the Department's proposed notice, and setting out its determination of several issues concerning an acceptable compliance plan "intended to clarify the issues necessary to draft an accurate Notice." The Department purports to appeal from that order.

### B. Conlan I

As described more fully in the *Conlan I* opinion, this litigation arose originally from the denial of three requests for direct reimbursement. One petitioner, Asher Schwarzmer, sought payment directly from the Department after his provider diligently but unsuccessfully sought reimbursement from the Department on Schwarzmer's behalf of payments he had made during the retroactivity and evaluation periods. The second petitioner, Kevin Conlan, sought reimbursement directly from the Department after his provider refused to seek reimbursement of eligible payments made during the evaluation period. The third petitioner, Thomas Stevens, participated in the Health Insurance Premium Payment Medi-Cal Program (HIPP) and sought reimbursement from the Department for prescriptions he had purchased after being accepted into the Medi-Cal program. The Department denied all three petitions, and the petitioners' fair hearing requests were dismissed by administrative law judges (ALJs) on the ground they had no jurisdiction to order direct payment to a Medi-Cal recipient.

The petitioners then petitioned the superior court for writs of mandate under Code of Civil Procedure sections 1094.5 and 1085 seeking to overturn the dismissal of their fair hearing requests and ordering the Department to establish a procedure by which Medi-Cal beneficiaries in similar circumstances can promptly obtain reimbursement of

5

covered expenses incurred during the retroactivity period. The trial court denied the petitions but this court reversed, holding that whether section 14019.3 satisfies the comparability requirement "must be answered pragmatically. The issue is not whether the statute creates an abstract right on the part of the recipient to obtain reimbursement from the provider, but whether a process has been established that offers reasonable assurance that the right will be respected, and that needy recipients entitled to reimbursement will receive the amounts to which they are entitled in a timely manner. If the latter is not the case, those recipients who have paid for covered services during the retroactivity period will continue to receive less in benefits than those who did not advance payment, in violation of the comparability requirement." (*Conlan I, supra,* 102 Cal.App.4th at p. 756.) This court concluded that the practice in California failed to comply with federal requirements and remanded to the trial court for the issuance of writs of mandate pursuant to Code of Civil Procedure section 1094.5 and, as indicated above, pursuant to Code of Civil Procedure section 1085 "directing the Department to adopt and implement procedures consistent with this opinion to ensure that Medi-Cal recipients entitled to reimbursement for covered services obtained during the retroactivity period are promptly reimbursed." (*Conlan I, supra,* at p. 764.)

## C. Post-Conlan I proceedings

*Conlan I* was filed on September 30, 2002. On March 14, 2003, petitioners returned to the trial court contending that, despite the clear direction in *Conlan I,* "DHS has informed petitioners' counsel that it does not intend to change its policies in the foreseeable future to comply with the appellate court judgment but instead plans to continue administering Medi-Cal reimbursement claims pursuant to its existing procedures . . . ." Petitioners requested "a writ directing respondents to implement a process for reimbursing Medi-Cal recipients who are owed reimbursement for out-of-pocket costs that complies with the requirements of the Court of Appeal decision. Petitioners also seek an order directing DHS to reimburse their individual claims."

In opposing the motion for enforcement, the Department argued that petitioners were "improperly attempting to expand the scope of the appellate court's holding to

6

include *all* Medi-Cal beneficiaries who incurred out-of-pocket expenses, not just those relating to the retroactivity period or to the HIPP co-payment issue." The Department asserted that it was attempting to develop and implement new procedures, but that "massive system changes will be required," and that "many components of development and implementation . . . lie outside the Department's control and . . . will require considerable time to resolve." It argued that it would need additional personnel and funding to implement a direct reimbursement plan, which would require "approval from both the executive branch and the Legislature."

A hearing on petitioners' motion for enforcement was held on April 30, 2003, and on May 12, 2003, the superior court issued an "interim order" in which it directed the Department to file within 60 days "a written Compliance Plan (Plan) setting forth the actions they propose to take to achieve compliance with the Court of Appeal decision." On July 11, 2003, the Department filed a motion entitled "Motion to Approve the Compliance Plan of the California Department of Health Services." The Department submitted a proposed plan but argued that the petition for a writ of mandate was moot because DHS had settled the claims of the three individual petitioners; that it was "making good faith *efforts to formulate a plan to develop a new system* for Medi-Cal reimbursement"; that the court should not instruct the ALJs to begin adjudicating reimbursement claims; and that "the lack of federal financial participation may limit the power of this court to implement the department's proposed compliance plan." (Italics added.)

The trial court held a hearing on November 18, 2003, at which the parties addressed the sufficiency of the proposed notice and the manner by which the Department would begin notifying beneficiaries of their right to reimbursement. The court suggested that notice be sent out with the next regularly scheduled quarterly notice to Medi-Cal beneficiaries.[4]  The Department argued that it did not have the resources to

---

[4]  These notices are sent out pursuant to a consent decree in an action entitled *Jackson v. Rank* (E.D.Cal. June 9, 1986, Civ. A. S-83-1451 LKK) 1986 WL 747746. In that case, the parties

7

add an additional notice to the mailing it was already planning to send, and that it did not have time to include notice in the next scheduled mailing

At that hearing, the parties also addressed several issues that were not addressed in *Conlan I*: the retroactivity of the decision; whether the procedure for reimbursement should encompass covered expenses incurred during the application period as well as the retroactivity period; whether beneficiaries should be reimbursed for services received from non-Medi-Cal providers; and whether beneficiaries should be reimbursed for their actual out-of-pocket expenses or only for their covered expenses at Medi-Cal approved rates. The court asked for additional briefing on these issues, and ordered the Department to submit a proposed form of notice to be sent to Medi-Cal beneficiaries.

After additional briefing and a hearing at which the parties addressed the content of the notice to be sent to beneficiaries, the Department submitted a revised notice. This notice provided that reimbursement was available only if the service was obtained from a Medi-Cal enrolled provider, the service was rendered during the retroactivity period or between the date of an erroneous denial of an application for benefits and the reversal of the denial, and the service was rendered on or after October 29, 2002. The final section of the notice provided that reimbursement from the Department was available only if "After you received your Medi-Cal card, you contacted your provider and showed your provider your Medi-Cal card and the provider would not give you your money back."

On March 3, 2004, the trial court issued an order in which it acknowledged the necessity of sending out notices promptly, but "also recognize[d] that the substance of the Notice must be accurate. Such accuracy mandates that the Court issue this order, then review the Notice once more before it is mailed." The court ordered that reimbursement be made available to "[e]very Medi-Cal recipient who received eligible medical services on or after June 27, 1997, the date this petition was filed . . . ," that reimbursement was required for services rendered during the evaluation period as well as during the

---

agreed and the court ordered that "The Department . . . send a quarterly mailing to recipients advising them of their right to fair hearings to contest Department action on prior approvals, and informing them how to request such hearings."

8

retroactivity period, that covered services rendered by non Medi-Cal providers were eligible for reimbursement at the full amount paid by the beneficiary, and that reimbursement is required even if a non-Medi-Cal provider fails to apply for temporary Medi-Cal participation. The court gave the Department until March 23, 2004 to file comments about the revised notice and scheduled a hearing for March 29, 2004.

In response, the Department sent the court a letter stating, "We are in receipt of a copy of the Court's order, filed March 3, 2004, denying the Department's motion to approve its Compliance Plan. [¶] We have decided to seek appellate review of the order. [¶] Accordingly, we wish to receive the benefit of the Court of Appeal's perspective on these central issues before we send out a further revised Notice." On April 7, 2004, the Department filed its notice of appeal.[5]

---

[5]  Although entered subsequently, we note from the register of actions that on May 10, 2004, the trial court entered a further order directing that notice be mailed on June 15, 2004 "to all current Medi-Cal beneficiaries who as Heads of Households would have had said notice mailed to them if the Notice had been included with the June 2004 *Jackson v. Rank* mailing." The notice states that under a "new process [that] is not yet ready," those who "paid for health care services during the time you were eligible for Medi-Cal . . . may be able to get some of your money back," and advises beneficiaries to "save any receipts or other proof of payment for Medi-Cal covered health care services you paid or will pay for yourself or eligible family members." The order also provides that the Department "shall not purge those Medi-Cal records in existence on or after June 15, 2004, which are necessary for contacting Medi-Cal beneficiaries who were issued benefits commencing as early as June 1997."

The Department has filed an unopposed request that we take judicial notice of the record in the previous appeal in this matter, which is hereby granted. (Evid. Code, § 452, subd. (d).)

The Department also asks that we take judicial notice of the California State Auditor's December 2003 report entitled, "Department of Health Services: It Needs to Better Plan and Coordinate Its Medi-Cal Anti-Fraud Activities." The Department suggests that judicial notice is appropriate under Evidence Code section 452, subdivisions (c) and (h). The Department asserts that the report is an official act and that because it is available on the internet "the contents of that report are 'not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy . . . ." The request for judicial notice of the report is denied. Beyond the mere fact that the report exists, the availability of the report on the internet hardly renders the content of the report "not reasonably subject to dispute." Although the report may well be an official act of the executive, the report was not brought to the attention of the trial court and there is not a single reference to the report in the appellate briefs of either party.

9

## DISCUSSION

### I. Appealability

"A reviewing court has jurisdiction over a direct appeal only when there is (1) an appealable order or (2) an appealable judgment." (*Griset v. Fair Political Practices Com.* (2001) 25 Cal.4th 688, 696; see also Code Civ. Proc., § 904.1.) "A trial court's order is appealable when it is made so by statute." (*Ibid.*) "The theory is that piecemeal disposition and multiple appeals in a single action would be oppressive and costly, and that a review of intermediate rulings should await the final disposition of the case." (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 58, p. 113.)

The order of March 3, 2004 from which this appeal is purportedly taken is not an appealable order. Contrary to the California Rules of Court, the Department's opening brief does not contain a statement "explain[ing] why the order appealed from is appealable." (Cal. Rules of Court, rule 14(a)(2)(B)) and its reply brief ignores the explanation in petitioners' brief as to why the order is not appealable. Ordinarily, this defect would be fatal and would require dismissal of the appeal for lack of jurisdiction. (See, e.g., *Jennings v. Marralle* (1994) 8 Cal.4th 121, 126.) However, a purported appeal from a nonappealable order may be treated by the appellate court as a petition for extraordinary relief. (See *Olson v. Cory* (1983) 35 Cal.3d 390, 400-401.) Although such discretion should be exercised only in extraordinary circumstances, we agree with petitioners that this case presents an appropriate occasion.[6] It has been nearly three years since *Conlan I* was decided, and thanks in no small part to the additional time required to process this inappropriate appeal, the Department's procedures remain out of compliance with the requirements of federal law. To dismiss the appeal would only further forestall compliance and delay reimbursement of covered health care expenses to those Medi-Cal recipients entitled to receive such reimbursement.

---

[6]  At oral argument the Department joined in the petitioners' request that this court treat the appeal as a writ petition.

10

## II. California law now provides for direct reimbursement to Medi-Cal recipients

When this case was first before this court, the Department took the position that it was prohibited from providing direct reimbursement to Medi-Cal recipients because California law did not provide any exception to the "vendor payment principle." After issuance of the decision in *Conlan I* rejecting this contention, the Legislature amended section 14019.3. The statute now provides explicitly:[7]:

"(a) A beneficiary or any person on behalf of a beneficiary who has paid for medically necessary health care services, otherwise covered by the Medi-Cal program, received by the beneficiary shall be entitled to a return from a provider *or directly from the department* of any part of the payment that meets all of the following:

"(1) Was rendered during *the 90-day* period prior to *application for, his or her Medi-Cal card, or after application for but* prior to the *issuance of,* his or her Medi-Cal card, for which the card authorizes payment . . . *or was charged to the beneficiary as excess copayment during the period after issuance of his or her Medi-Cal card.* . . . [¶] . . . [¶] . . .

"*(g) The department shall ensure payment to a beneficiary from a provider. A provider shall be notified in writing by the department when a beneficiary has submitted a claim to the department for reimbursement of services provided during the periods specified in paragraph (1) of subdivision (a). If a provider is not currently enrolled in the Medi-Cal program, the department shall assist in that enrollment. Enrollment in the Medi-Cal program may be made retroactive to the date the service was rendered.*

"*(h) If a provider fails or refuses to reimburse a beneficiary for services provided during the periods specified in paragraph (1) of subdivision (a), within 90 days of receipt by the department of a written request by a beneficiary or a representative of a*

---

[7] The italicized portions are language that was added in 2002. Language that was deleted is not indicated.

*beneficiary, the department may take enforcement action that may include, but shall not be limited to, any or all of the following:*

"*(1) Withholding of future provider payments.*

"*(2) Suspension of a provider from participation in the Medi-Cal program.*

"*(3) Recoupment of funds from a provider.*

"*(i) If a provider fails or refuses to reimburse a beneficiary within 90 days after receipt by the department of a written request from a beneficiary or a representative of a beneficiary, the department shall directly reimburse a beneficiary for medically necessary health care expenses incurred during the periods specified in paragraph (a) of subdivision (a). The department shall reimburse a beneficiary only to the extent that federal financial participation is available and only when the claim meets all of the following criteria:*

"*(1) The service was a covered benefit under the Medi-Cal program.*

"*(2) The provider was an enrolled Medi-Cal provider at the time the service was rendered.*

"*(3) The service was ordered by a health care provider, within the scope of his or her practice.*

"*(4) The beneficiary is eligible for reimbursement . . .*

"*(5) The reimbursement shall be the amount paid by the beneficiary, not to exceed the rate established for that service under the Medi-Cal program.*

"*(j) . . . [T]his section may be implemented by a provider bulletin or similar notification, without any further regulatory action.*"

By these amendments, the Legislature clearly intended to embrace the decision in *Conlan I.* When the changes were proposed, they were described as "Conlan Lawsuit Changes: This bill makes statutory changes needed to comply with the *Conlan v. Bontá* decision. In this decision, the Appellate Court held that the state must establish a reasonable procedure by which recipients may obtain prompt reimbursement for covered services for which they paid during the three months prior to applying for Medi-Cal coverage. The court further found that the recipient should not be required to wait until

the provider submits and is reimbursed for a claim for services rendered, before being reimbursed." (Sen. Rules Com., 3d reading analysis of Assem. Bill No. 1762 (2003-2004 Reg. Sess.) June 23, 2003.) The description of the amendments recited that they would: "Require a Medi-Cal beneficiary be repaid by a provider or directly from DHS for co-payments paid for medically necessary services provided within the 90 day period prior to the beneficiary's application for the Medi-Cal card. The beneficiary must also be repaid for co-payments made after the application, but prior to the issuance of the Medi-Cal card. A Medi-Cal beneficiary must be repaid if the person is charged an excess co-payment during the period after the issuance of the Medi-Cal card. DHS must ensure payment to beneficiary from the provider, if the provider refuses, DHS may withhold future funds from the provider, suspend the provider from participation in the program or recoup funds from the provider." (Sen. Conc. Amends. To Assem. Bill No. 1762 (2003-204 Reg. Sess.) as amended July 27, 2003.)

## III. The trial court's order

Because of the unusual procedural posture, this case is now before this court to review the trial court's March 3, 2004 order regarding the sufficiency of the proposed notice to Medi-Cal recipients. Nevertheless, the Department's challenge to the trial court's order requires consideration of the substantive arguments the Department has advanced as to why it should not be required to comply with *Conlan I* as the trial court has construed this court's prior opinion and other applicable provisions of law not considered in *Conlan I.*

The trial court's order explicitly addressed five questions concerning compliance with *Conlan I*: "1. Who should receive the Notice?" "2. Should *Conlan* be applied retroactively?" "3. Should covered services provided during the 'evaluation period' be covered?" "4. Will covered services rendered by non-Medi-Cal providers be eligible for reimbursement?" "5. [Whether] [f]ull reimbursement is required." Before considering the trial court's answers to these specific questions, we shall first address the Department's overarching arguments which color its entire brief and suggest that no enforcement of *Conlan I* is appropriate. Foremost among these contentions is the

13

Department's assertion that it cannot comply with *Conlan I* until it has secured vast amounts of additional funding.[8]

### *A. Funding issues*

The Department asserts three reasons why it cannot afford to implement a plan that would bring its practices into compliance with *Conlan I*. First, it asserts that nothing may be done until the State approves a budget that includes money for the changes. Second, it argues that compliance would jeopardize federal funding (known as Federal Financial Participation, or FFP) for the entire Medi-Cal program. Finally, it argues that if it begins to allow Medi-Cal recipients to be reimbursed before a formal plan is constructed, it risks incurring crushing penalties under a 25-year-old consent decree in another action. None of these contentions excuses timely compliance with the Department's duties.

In initially opposing the motion for enforcement, the Department argued that it was acting in good faith to implement *Conlan I*. The Department outlined steps it had taken to implement the changes required by *Conlan I*: "[1] The Department submitted

---

[8]  The Department also argues that a 2002 decision of the United States Supreme Court, *Gonzaga Univ. v. Doe* (2002) 536 U.S. 273 (*Gonzaga*), indicates that there is no enforceable individual right to compliance with the comparability requirement. The Department acknowledges that it did not make this assertion when *Conlan I* was before this court because, it says, the cases were decided "contemporaneously." However, *Gonzaga* was filed on June 20, 2002, and oral argument in *Conlan I* was heard on August 21, 2002 and the opinion did not issue until September 30, 2002. Moreover, not only did the Department fail to bring this case to the attention of the court in the prior appeal when it had the opportunity to do so, it did not raise the issue at any time during the extended hearings in the trial court over compliance.

In all events, *Gonzaga* dealt with the Family Educational Rights and Privacy Act, and held that the act creates no personal rights enforceable under 42 United States Code section 1983. In *Wilder v. Virginia Hospital Assn., supra,* 496 U.S. 498, the Supreme Court held that the provisions of Medicaid are enforceable by individuals. In *Gonzaga*, the court explicitly let that holding stand. The enforcement provisions of the Family Educational Rights and Privacy Act "squarely distinguish this case from . . . *Wilder*, where an aggrieved individual lacked any federal review mechanism." (*Gonzaga, supra,* 536 U.S. at p. 275; see also *Michelle P. ex rel. Deisenroth* (E.D.Ky. 2005) 356 F.Supp. 763, 767-768.) Moreover, the petitioners' claims to enforce their individual personal rights have been settled and are no longer before the court. The proceedings at this point concern only the petition under Code of Civil Procedure section 1085 to compel the Department to comply with its statutory obligations. Nothing in *Gonzaga* stands for the proposition that they may not do so.

14

trailer bill language to fiscal forecasting . . . along with the estimated fiscal amount needed for implementation. . . . [2] If the funding request is included in the budget for fiscal year 2003-2004, it must first be passed by the Legislature and the necessary legislation signed by the Governor . . . . Upon the Governor's signature, the Department's fiscal intermediaries Electronic Data Systems (EDS) for the Medi-Cal fee-for-service program and Delta Dental for the Medi-Cal dental program, both private companies, can start work on the system changes. EDS and Delta Dental have estimated thirteen months from the time they receive funding to completion. . . . [3] The Department has solicited and received a proposal from EDS for the required system changes. . . . The Department also has held several meetings with Departmental units and contractors to discuss and plan critical processes needed for implementation. . . . [4] The Department has completed a Budget Change Proposal (BCP) which will be submitted. The purpose[] of the proposed BCP is to acquire positions for Payment Systems Divisions and accounting staff that will be necessary to implement the Department's reimbursement process. . . . [5] The Department prepared and sent a memorandum to the [federal] Centers for Medicare and Medicaid Services (CMS) to advise CMS regarding the *Conlan* decision and confirm necessary federal financial participation (FFP) availability for the Department's reimbursement process." (Fns. omitted.)

The Department then listed the steps it asserted "must also be completed before the Department's reimbursement process can be implemented: [¶] The Department must amend the currently existing fiscal intermediary contracts. It must also amend the interagency agreement with the Department of Social Services, which provides the . . . ALJs who hear fair hearing for Medi-Cal beneficiaries . . . . The Department must meet with and determine the necessary extent of interagency agreement amendments with the Department of Social Services regarding the reimbursement process and incorporating the right to a fair hearing to contest Departmental determinations."

Next, the Department set forth "the major barriers to implementing any reimbursement process in response to appellate court's decision . . . : [1] The lack of a State budget to fund the necessary expenditures. . . . The Department has preliminarily

15

estimated additional annual costs of: $30 million for fiscal intermediary costs, $1.1 million for Department staff, $1 million for Department of Social Services Administrative Law Judges, and $2.5 million for Medi-Cal program reimbursement of beneficiaries. . . . [2] The lack of current Department staff positions necessary to administer such a new process. The Department will require contract oversight and accounting staff in order to implement a beneficiary reimbursement process. The Department will also require regulations to specify the exact reimbursement process as well as beneficiary claim review criteria.[9] The number of staff needed and the extensiveness of the program and system changes required precludes the Department from redirecting existing staff because other essential program and state work could not be completed. . . . [3] The lack of any current process to review and pay any beneficiary claims, either as an interim or a long-term process. Currently, the Department does not have the capacity to perform this function . . . . [4] The length of time needed by the fiscal intermediaries to implement any changes. EDS and Delta Dental have proposed a minimum of thirteen months from the time they receive funding to accomplish the necessary system changes. The Department will need six to twelve months to hire and train the necessary State staff following approval of state funding."

At the April 30, 2003 hearing on the motion for enforcement, the Department asserted, "there is also the issue of federal financial participation. And the state is only participating in Medicaid to the extent that it receives funding from them, and there is no guarantee there will be funding to provide this reimbursement. And if there is no funding to provide the reimbursement, then we are in a situation where the court is ordering a brand new state-only program which is not subject to the comparability provisions. Because those comparability provisions are federal provisions which would only apply to

---

9   This opposition was filed on April 14, 2003, and makes no mention of the 2002 amendments to section 14019.3, subdivisions (a) and (j), which provide that the Department may directly reimburse beneficiaries and that "this section may be implemented with a provider bulletin or similar notification, without any further regulatory action."

16

the extent that the state is receiving money from the federal government, which there is no confirmation that they will receive yet."

In its papers submitted in support of its motion to approve the compliance plan, the Department continued to argue that financial considerations outside of its control hindered compliance. The Department reiterated, "California participates in Medicaid only to the extent that Medi-Cal receives reimbursement in the form of FFP for its services. [Citation.] [¶] The Department has sought, but has not yet been received [*sic*], approval for FFP based upon the criteria set forth in the proposed Compliance Plan. . . . If Federal Financial Participation is denied, then this Court may not require the Department to pay these claims." The Department argued, "In order to develop and implement the claims evaluation and reimbursement processes, massive system changes will be required to the Medi-Cal Program, which will include additional state staff in order to provide beneficiary claims evaluation and reimbursement."

Ironically, by way of illustrating its doomsday scenario, the Department submitted an October 7, 2003 letter to its director from the federal agency regulating state Medicaid programs, Center for Medicaid and Medicare Services (CMS) (formerly the Health Care Financing Administration), informing the Department that its federal funding was being reduced because of the Department's failure to comply with other federal requirements.[10] Tellingly, the letter stated that the reduction "pertains to California consistently overestimating its Medicaid (called Medi-Cal) administrative expenditures. The State

---

[10]  The first among these the letter describes as follows: "We reduce the grant award by $16,388,000 (FFP) which represents forty percent of the costs, resulting from the *Craig v. Bonta* court order . . . . A California Superior Court Order dated June 24, 2002 in the lawsuit *Craig versus Bonta* required the State to develop and implement a process to ensure recipients losing SSI receive a redetermination before termination within 120 days of the Court's order. Due to a delay in obtaining a court-approved implementation plan, the State did not issue instructions for the redetermination process until May 6, 2003. The State's timeline for completing all of the redeterminations (which have been suspended in a backlog status since July 2002) is January 1, 2004. The State estimated that forty percent of these recipients losing SSI might not be eligible for Medicaid."

17

has overestimated its budgeted administrative expenditures in each of the last eight quarters. The overestimates have ranged from 7.48 percent to 30.43 percent."

### 1. State and federal financing

As to the availability of federal funding, the Department inverts the logic of *Conlan I*. There, this court held that *because* California receives federal funds for the Medi-Cal program it must comply with the federal requirements by providing a means of reimbursement to Medi-Cal participants. Now the Department insists that it *cannot* comply with these requirements *until* the federal government assures it that funding will be provided. The Department argues that it needs to obtain assurances of federal financial participation from CMS to implement *Conlan I*. "[W]ithout CMS approval, and in turn FFP, such reimbursements would lie outside of the Medi-Cal program, and thus, outside the parameters of *Conlan*." Yet the very basis of the holding in *Conlan I* is that the Department is violating the federal comparability requirement by failing to refund money to those who are entitled to such refunds. California receives federal funding for Medi-Cal through the federal Medicaid program. "State participation in Medicaid is voluntary but if a state participates, it must comply with the federal statutes and regulations governing the programs." (*Conlan I, supra,* 102 Cal.App.4th at p. 753.) It was the Department's failure to comply with the federal regulations requiring comparable benefits to participants that prompted the decision in *Conlan I*. To now argue that the Department must ensure that additional federal funds are available before complying with this court's decision ignores the fact that the Department has received and continues to receive federal Medicaid funds and is obligated to comply with the requirements of the federal statute. As illustrated by the October 3, 2003 letter from CMS cited above, receipt of federal funds may be endangered by the Department's failure to comply with these requirements.

Federal regulations indicate that federal funding is available for reimbursements made in response to this court's ruling in *Conlan I*. Title 42 Code of Federal Regulations part 431.250(b)(2) provides that FFP is available for payments made "[f]or services provided within the scope of the Federal Medicaid program and made under a court

18

order." Subdivision (d) of that part provides that FFP is available for "[p]ayments made to extend the benefit of a hearing decision or court order to individuals in the same situation as those directly affected by the decision or order." Courts in other states have imposed the same or similar requirements on their Medicaid programs and no one has suggested that those states have lost their federal funding. (See, e.g., *Blanchard v. Forrest* (5th Cir. 1996) 71 F.3d 1163; *Kurnik v. Dept. of Health & Rehab. Serv.* (Fla.App.Ct.App. 1995) 661 So.2d 914; *Kreiger v. Krauskopf* (1986) 121 A.D.2d 448; *Lustig v. Blum* (1981) 80 A.D.2d 558; *Cohen by Cohen v. Quern* (D.C.Ill.1984) 608 F.Supp. 1324.)

What is more, the Department's dire cost predictions ring hollow. Immediately upon remand the Department began objecting that implementing a plan that would comply with *Conlan I* would cost millions of dollars. The Department "preliminarily estimated additional annual costs of: $30 million for fiscal intermediary costs, $1.1 million for Department staff, $1 million for Department of Social Services Administrative Law Judges, and $2.5 million for Medi-Cal program reimbursement of beneficiaries. . . ." These numbers were submitted before any plan had been drafted. In support of its motion to approve the nebulous plan it later submitted to the court,[11] DHS predicted "enormous potential reimbursement costs to the State required by *Conlan* . . . . [T]he estimated annual reimbursement cost for persons newly eligible to receive Medi-Cal ranges from a low of $7,422,000 to a high of $99,258,000 . . . , while the projected

---

[11] When asked to approve the plan, the trial court stated, "Maybe I just have trouble reading government plans. I read through this and I have a lot of trouble finding out what is going to happen. What are you going to do?" We share the trial court's quandary. The proposed implementation plan identifies 13 "steps," one of which is "Budget is signed by the Governor and is enacted with requested funding and trailer bill language is incorporated." The plan is arranged into "pre-interim," "interim" and "permanent" processes, each of which requires, among many other things, the Electronic Data Systems (EDS) staff to "work with the provider to get the beneficiary reimbursed" (the pre-interim and interim processes add the caveat "as resources permit"). Under the permanent process, "If the Medi-Cal enrolled provider will not cooperate, EDS will directly reimburse the beneficiary for approved costs and start" a separate process directed to the provider. "If the non-enrolled provider will not cooperate," the plan recites, "DHS cannot directly reimburse the beneficiary or force the provider to cooperate."

19

annual reimbursement cost of copayments for persons on Medi-Cal with Other Health Coverage ranges from $4,000,000 to $24,555,000."[12]

Before *Conlan I*, DHS routinely reimbursed providers for covered services provided during a Medi-Cal recipient's retroactivity and evaluation periods and the provider then reimbursed the recipient. It was only when that system failed and the Medi-Cal beneficiary did not obtain reimbursement from the provider that a problem arose. The Department has never disputed that beneficiaries such as Conlan and Schwarzmer are entitled to be reimbursed for their covered expenses incurred during these periods. In commenting on the petitioners' response to its proposed notice below, the Department stated, "Enrolled provider-based remedies are not only available now to beneficiaries, but they always have been. The existing provider process is not new.

---

[12]   In the declaration submitted to support this statement, the Chief of the Fiscal Forecasting and Data Management Branch (FFDMB) stated that "[t]he local assistance cost of administratively implementing the provisions of *Conlan* has been identified by the Medi-Cal fiscal intermediaries. For Electronic Data Systems (EDS), which processes medical claims for the Medi-Cal Program, EDS has identified costs as approximately $1,148,000 in Fiscal Year 2002-2003 and $6,668,000 in Fiscal year 2003-2004. There will also be ongoing costs. (Fn. omitted.)  Delta Dental . . . has identified costs of approximately $1,530,000 in Fiscal Year 2002-2003 and $1,000,000 in Fiscal Year 2003-2004. There will also be ongoing costs." No explanation was provided of what the "ongoing costs" would be.

The supporting declaration explained that these numbers were derived in this manner: "In order to determine the potential impact of *Conlan v. Bonta* on the benefit costs for new eligibles, FFDMB completed a study of eligibles who were new in March 2002 (not on Medi-Cal in the previous two months.) Based on this study, I estimated that approximately 1,000 of the persons eligible for Medi-Cal each month are retroactive eligibles, that is, their eligibility is for one of the three months prior to the month in which they applied for Medi-Cal, with an average cost of $729 per month, and that approximately 155,000 are regular eligibles reported retroactively because of the time it took to determine their eligibility, with an average monthly cost of $352. The data available does not identify the additional benefits that will be paid for under the requirements of *Conlan*. As there is insufficient data about the services Medi-Cal beneficiaries pay for out-of-pocket for which they cannot get reimbursed once they are found eligible, I made a number of assumptions to determine the potential cost range for *Conlan* after its provisions are fully implemented. I assumed that, at a minimum, there would be a 10% increase in the cost for retroactive eligibles plus a 1% increase in the cost for eligibles reported retroactively. This minimum cost would be $7,422,000. I also assumed that the maximum increase would be a 20% increase in the cost for retroactive eligibles, plus a 15% increase for eligibles reported retroactively. Based on this, the maximum cost would be $99,258,000." (Fn. omitted.)

20

Petitioners' assertion that the Department is not making available enrolled provider-based reimbursement of evaluation period expenses is just plain wrong. Nearly all beneficiaries are getting paid from the existing enrolled provider-based reimbursement process. *The overwhelming majority of beneficiaries are getting their money*." (Italics added.) Under the former section 14019.3, providers first received payment from the Department before reimbursing the beneficiary. *Conlan I* did not create a new class of claimants; it mandated only the adoption of some procedure to ensure that existing claimants receive the reimbursement to which they have always been entitled.

The petitioners may have stated the point most succinctly in a letter which they sent to CMS that is included in the record: "Under DHS' process prior to *Conlan*, a recipient could be paid if her provider requested and received reimbursement from DHS and then reimbursed the recipient. *Conlan*, 102 Cal.App.4th at 755-58. Full FFP is available for this process. The *Conlan* decision merely reshapes the process and orders DHS to devise a plan to ensure that beneficiaries actually get paid. This can be done either through direct reimbursement or through a system which ensures that providers promptly reimburse recipients. *Id.* at 764. The reimbursement itself—for which FFP is already available—is unchanged in form and purpose, while *Conlan* merely replaces the vehicle that carries it to the recipient."

In any event, an agency may not use lack of funding to excuse failure to comply with the law. In *Mooney v. Pickett* (1971) 4 Cal.3d 669, San Mateo County denied General Assistance benefits to employable single men. The Supreme Court held that this violated state law, and rejected the county's contention that it could not afford to offer these men assistance because doing so would double the cost of the General Assistance program. "We are aware of the financial difficulties which attend present welfare programs on local, state, and national levels. This court, however, is not fitted to write a new welfare law for the State of California, and while the Legislature addresses itself to that task it remains our task to enforce the existing law. We observe that the county retains extensive authority to establish standards for General Assistance, both as to eligibility and as to amount of aid. In view of this discretion, the county can surely find

21

many ways which do not violate state statute in which it can limit General Assistance payments to the financial resources available." (*Id.* at p. 680.)

Likewise, in *Association for Retarded Citizens v. Department of Developmental Services* (1985) 38 Cal.3d 384, the Supreme Court invalidated "priorities" set by the Director of the Department of Developmental Services (DDS) that would have cut entire categories of benefits without regard to the needs of individual aid recipients. "To be sure, as defendants contend, the regional centers may spend no more money to provide services than the Legislature has appropriated. Contrary to defendants' apparent belief, however, this fact does not mean that the Act grants no right to any services at state expense, or that it grants the right to only such services as DDS can equitably provide to all eligible persons within the limits of the annual legislative appropriation. What it does mean, rather, is that so long as funds remain, the right must be implemented in full; as soon as they are exhausted, it can no longer be implemented, but may be financed through an additional appropriation if the Legislature so chooses." (*Id.* at p. 393.)

### 2. Ball v. Swoap penalties

In support of the motion to approve its implementation plan, the Department argued that a 1985 order from the Alameda County Superior Court in an action entitled *Ball v. Swoap* (No. H105716-0) would require the Department to pay crushing penalties if it failed to mail notice of fair hearing decisions to prevailing claimants within 90 days of their fair hearing requests. In *Ball v. Swoap*, the court retained jurisdiction to ensure that the Department reaches final hearing decisions in a timely manner. Here, DHS has argued, "In a bygone era, that Court decided that . . . monetary penalties would attach, apparently in perpetuity, during all the months subsequent to April 1, 1988 during which the ALJ process failed to produce timely decisions, as defined, in at least 95% of the active caseload." After setting forth the penalty schedule ordered in that case, the Department continued, "Simple arithmetic suggests that the potential pricetag of *Ball v. Swoap* penalties if there is not 95% compliance, as described, could cost the State from $3.35 Million . . . to $8.04 Billion in a worst case scenario where 67,000 fair hearing decisions are 40 months late. The simple point to be made is that any imposition of *Ball*

22

*v. Swoap* penalties would spell certain disaster—certain financial disaster—in an environment in which it is indisputable, at the outset, that the present fair hearing process is wholly incapable of accommodating the floodgates that will be opened to fair hearings unless they are all restricted and completely put out of reach, at least until the Plan's permanent process is completely implemented . . . ."

The assertion that complying with this court's order will cost the Department between $3.35 million and $8.04 billion because of penalties the court may impose in *Ball v. Swoap* is, to put it mildly, preposterous. The consent decree in *Ball v. Swoap* authorizes penalties only if the Department does not issue 95 percent of its fair hearing decisions within 90 days of the request for a hearing. The Department's estimate assumes that one percent of all Medi-Cal recipients, or 67,000 people annually, will request fair hearings as the result of having been denied reimbursement first by their providers and then by the Department itself, and that none of the 67,000 hearings will be decided within the 90-day limit. The Department provides absolutely no basis for such an assumption. There were only 8,274 administrative hearings in all other Medi-Cal cases in the most recent one year period for which statistics were available. In all events, even if the backload of fair hearing cases were to be affected by the decision in this case, the proper means of seeking relief from the penalty provision, if any relief is appropriate, is an application to the court in *Ball v. Swoap*.

"It is inherent in our system of judicial review of agency adjudication that once a court has passed on a question of law in its review of agency action, the agency cannot act inconsistently with the court's orders." (*George Arakelian Farms, Inc. v. Agricultural Labor Relations Bd.* (1989) 49 Cal.3d 1279, 1291.) *Conlan I* recognizes the broad discretion of the Department to determine the most appropriate means to bring its practices into compliance with federal law. In seeking to carry out the mandate of this court, the trial judge displayed exceptional patience and willingness to tailor an order to accommodate the practicalities of the situation. But, as we stated in *Conlan I*, "While the method of accommodating such considerations is within the discretion of the Department,

23

. . . ignoring the recipients' rights and doing nothing is not an option." (*Conlan I, supra,* 102 Cal.App.4th at p. 764.)

### *B. Issues relating to specific provisions of the implementation plan*

The Department contends that the trial court erred because "rather than directing DHS to develop a plan to comply with *Conlan*, the court attempted to direct the contents of that plan and improperly control DHS's discretion." That is hardly a fair characterization of the lengthy trial court proceedings. The Department requested additional time to formulate its implementation plan and then requested the court's approval of its plan. With the benefit of extensive briefing and argument, the court considered the petitioners' objections to the plan submitted by DHS and the justifications advanced for not including additional measures that petitioners contend are required either by this court's prior decision or other applicable provisions of law. The alternative would have been to immediately issue a writ of mandate as directed in *Conlan I* and address petitioners' objections and the Department's excuses for non-compliance in subsequent contempt proceedings. The Department resisted that approach and is hardly in position to criticize the trial court for having acceded to its requests for guidance. We now evaluate the trial court's determination of the disputed issues, so that implementation of an acceptable plan may proceed without further delay.

#### *1. To whom notice must be sent*

The trial court's order states that "Respondents have agreed to send the Notice [advising of the new procedure for obtaining reimbursement] to all current Medi-Cal recipients. They have indicated that they have no addresses for past recipients. It is unacceptable that all former Medi-Cal recipients, even those who terminated their participation yesterday, will be unable to recover their covered expenses simply because Respondents may not maintain a database of recipients. The Court encourages Respondents to locate a source of information that will identify former Medi-Cal recipients. While the Court understands that Respondents may not have current addresses for several of these individuals, Respondents should attempt to send the Notice to both current and former Medi-Cal recipients."

24

The Department has not directly questioned this portion of the court's order, and we discern no basis for doing so. To the extent practicable, notice of the new procedure should be given to all those who may have claims for reimbursement, including individuals who are no longer Medi-Cal recipients but whose potential claims are still viable. We share the trial court's skepticism that there are no means of identifying any former recipients, and trust that reasonable good faith efforts will be made to do so.

### 2. *Retroactivity*

*Conlan I* did not address the date to which that decision is retroactive. Following argument on this issue, the trial court ordered that "Every Medi-Cal recipient who received eligible medical services on or after June 27, 1997, the date this petition was filed, should receive the Notice." The Department argues that it has no duty to provide reimbursement to those who were enrolled in Medi-Cal prior to this court's decision in *Conlan I* and that "*any* form of retroactive monetary damages is barred by sovereign immunity."

The reimbursement of covered expenses is not a form of monetary damages barred by sovereign immunity. As indicated above, the Department has never claimed that Medi-Cal beneficiaries are not entitled to reimbursement for covered expenses incurred during the retroactivity or evaluation periods, but only that DHS is not required to provide the reimbursement directly to the recipients. In *Hypolite v. Carleson* (1975) 52 Cal.App.3d 566 (*Hypolite*), the plaintiffs represented a class who had been denied welfare benefits on the basis of a regulation promulgated by the Director of the Department of Social Welfare. The regulation was held to be invalid and the case was remanded to the trial court "with directions to grant a peremptory writ of mandate." (*Id.* at p. 574.) The trial court issued the writ, enjoined the Director from enforcing the invalidated regulation, ordered the administrative decisions regarding the named plaintiffs to be set aside and retained jurisdiction to determine retroactivity with regard to the class. The court ultimately decided that the "members of petitioners' class shall be entitled to the restoration of all those monies withheld pursuant to [the regulation] from" the date that the original complaint had been filed. (*Id.* at p. 575.) The Court of Appeal

25

held that the benefits were a debt owed to each class member "from the date he was 'first entitled to receive the aid.' " (*Id* at p. 584.) The court also held that "principles of 'equity, comity and federalism' " embodied in the Eleventh Amendment to the United States Constitution did not bar the award of retroactive benefits because those principles only " 'restrain' a *federal* court in that context, they do not inhibit a California court in the present case . . . ." (*Id.* at pp. 584-585.) The court based its reasoning in part on an earlier decision holding that "a person who ha[s] been wrongfully denied public assistance benefits [is] entitled to the full payment thereof,' from the date he was '*first entitled* to receive the aid,' upon the theory that '[t]he obligation to pay became a *debt* due' to him as of that date. [Citation.] To hold otherwise . . . would provide a money-saving device for the [debtor] counties at the expense of those of our citizenry least able to bear the burden thereof.' " (*Id.* at p. 583; see also *Tripp v. Swoap* (1976) 17 Cal.3d 671, 677, overruled on other grounds in *Frink v. Prod* (1982) 31 Cal.3d 166, 180 [ordering payment of benefits from the date application was filed] and *Green v. Obledo* (1981) 29 Cal.3d 126, 143.)

This reasoning applies equally here. The trial court appropriately exercised its discretion in choosing the date back to which *Conlan I* would be applied. (See *Hypolite, supra,* 52 Cal.App.3d at p. 585 ["a practical application of the theory to a class of claimants requires that retroactive relief be granted back to a single date which has some relevance and which is feasible, in practical fact, when applied to the class under the realities of the situation"]; *Green v. Obledo, supra*, 29 Cal.3d at p. 142 ["the trial court, acting as a court of equity, has discretion to fix a more realistic starting date for the payment of retroactive benefits to class members"].) The trial court did not err in considering *Conlan I* retroactive to the date on which the petition was filed,[13] and in ordering that notice be sent to past and present Medi-Cal beneficiaries.

---

[13] This date is also somewhat arbitrary since Conlan, Schwarzmer and Stevens were enrolled in Medi-Cal and incurred their expenses well before that date. However, as the *Hypolite* court noted, there must be some practical date to encompass a class of claimants. Petitioners do not

26

### *3. Expenses incurred during the evaluation period.*

The notice that DHS proposed sending to beneficiaries indicated that reimbursement would be available only for covered services provided during the three months before the beneficiary's application for benefits was submitted to Medi-Cal, and for the period between any denial of coverage and the determination that the denial was erroneous, but not for the period during which the application was being processed. The trial court concluded that such a gap in the period for which reimbursement is provided is not justified. "Under *Conlan*, DHS must also reimburse expenses incurred while the application is pending. This is precisely the situation in which petitioner Kevin Conlan found himself. He applied for coverage in October 1997 when his baby was born and the application was not granted until April 1998. When he applied for reimbursement for expenses incurred between October 1997 and April 1998, DHS denied reimbursement. The Court of Appeal found this treatment unacceptable and ordered DHS to create a plan that would cover the situation that Kevin Conlan faced. Accordingly, the Notice should indicate that recipients can apply for reimbursement for the three-month period before they applied for Medi-Cal benefits, for the time period during which their application was pending, and for the time period between a denial of their application and the reversal of that decision."

The Department continues to argue that *Conlan I* requires the Department to ensure reimbursement of expenses incurred only during the retroactivity period—the 90 days before an application for Medi-Cal benefits is submitted—and not during the evaluation period—the period between submission and approval of the application. In the Department's view, an individual enrolled in the Medi-Cal program must receive reimbursement for covered expenses incurred for three months before applying to the program and is covered for services after being admitted into the program, but has no recourse to obtain reimbursement for covered expenses incurred between those two

---

argue that benefits should be extended to an earlier date and agree that June 27, 1997, is a logical and reasonable cut-off date.

27

periods, while the application was being processed. DHS urges this nonsensical conclusion based on the fact that the opinion in *Conlan I* speaks only of the "retroactivity period." But that is because in the original litigation the parties disputed only the right to obtain reimbursement for the earlier period. There was no question that if a method of reimbursement were required for covered services provided before submission of an application for benefits, no less would be required for the period during which the application is pending. The claims of two of the petitioners—Conlan and Schwarzmer— included reimbursement for services obtained after their applications had been submitted and it was never suggested that those claims should be treated differently from claims arising during the retroactivity period. (See *Conlan I*, *supra*, 102 Cal.App.4th at p. 750.) No possible rationale for such differentiation has ever been suggested.

Regardless of what was addressed explicitly in *Conlan I*, the Department's position is contrary to the requirements of section 14019.3, subdivision (a)(1), as that section was recently amended. The statute now provides that a beneficiary is entitled to reimbursement from the provider "or directly from the department" of any payment for covered services that "[w]as rendered . . . after application for but prior to the issuance of, his or her Medi-Cal card." Indeed, DHS acknowledged as much when corresponding with CMS. The Department wrote to the Associate Regional Administrator for Medicaid to "solicit support, receive clarification, and to confirm that federal financial participation (FFP) will be available when the Department acts in response to" *Conlan I*. In that letter, it stated that since *Conlan I*, "the Department has been in discussions with the petitioners' attorneys and the scope of this decision has been determined by our Office of Legal Services to be extensive. Recoupment of expenses incurred by the Medi-Cal beneficiary from the provider of services and reimbursement of the beneficiary for these expenses includes services received during three distinct time periods, (1) the three months retroactive eligibility period (three months retroactive from the date of application for Medi-Cal eligibility), (2) *during the period of eligibility determination* (from the date of application to receipt of the Medi-Cal card), and (3) at least for the purposes of co-payments, the post eligibility period." (Italics added.)

Plainly the trial court was correct in determining that the implementation plan and the notice of the plan must include the so-called evaluation period.

### 4. Services obtained from non-Medi-Cal enrolled providers

In its March 3, 2004 order, the trial court answered the disputed question, "Will covered services rendered by non-Medi-Cal providers be eligible for reimbursement?" as follows: "As a part of the Medicaid program, Medi-Cal must provide comparable medical services to every participant. Accordingly, each participant must be reimbursed whether they received covered services from a Medi-Cal provider or from a non-Medi-Cal provider. Respondents suggest that non-Medi-Cal providers could apply for temporary Medi-Cal participation. This proposed solution creates a new version of the same problem presented in *Conlan*. The non-Medi-Cal providers have no financial incentive to apply for temporary Medi-Cal status and thus, most likely will not. If even one doctor does not apply, the comparability provision of the Medicaid Act would be violated. In order to comply with *Conlan*, this Court requires that Respondents' Notice inform Medi-Cal recipients that they may be entitled to reimbursement for covered services provided by either Medi-Cal or non-Medi-Cal providers."

The Department contends it should not be required to provide reimbursement for medical services supplied by providers that are not enrolled in Medi-Cal and subject to its restrictions. We conclude there is partial merit in the views of both the trial court and the Department. A distinction must be drawn in this respect between the retroactivity and evaluation periods. Absent evidence of fraud, the Department must provide reimbursement for covered expenses paid to any provider during the retroactivity period, but only for services from enrolled providers during the evaluation period, provided that applicants are given notice at the time they apply for benefits that only services from enrolled providers will be reimbursed.

In *Carroll v. DeBuono* (N.D.N.Y. 1998) 998 F.Supp. 190, a group of Medicaid recipients in New York State were denied reimbursement for expenses incurred during the retroactivity period because the services were rendered by non-Medicaid providers. The state agency administering the program had promulgated a regulation declaring that

29

reimbursement was available only where "the medical care and services were furnished by a provider enrolled in the Medicaid program." (*Id.* at p. 193.) The court held this regulation was invalid. "To begin, the federal retroactive eligibility statute does not, by its terms, limit reimbursement during the retroactive period to only persons obtaining care from Medicaid-enrolled providers. 42 U.S.C. § 1396a(a)(34). Nor can such an express limitation be found in any federal regulation. *See* 42 C.F.R. § 435.914." (*Carroll v. DeBuono, supra,* at p. 196.) "The statute's purpose is to ensure that otherwise eligible persons receive financial protection prior to application." (*Ibid.*)

The court rejected the agency's argument, similar to that made by DHS, that fraud prevention is a compelling reason for limiting reimbursement to Medicaid enrolled providers for services obtained during the retroactivity period. The court reasoned "that fraud, whether individually perpetrated by the preapplicant or medical provider, or through collusion between these parties, appears particularly unlikely in the situation at issue here. Preapplication individuals are unlikely to be aware that Medicaid coverage might be forthcoming, and as such are unlikely to engage in fraud. Likewise, hospitals or other facilities rendering services to such individuals have no motivation to engage in fraudulent service provision or charging practices either. To the extent that a hospital or providing doctor is more likely to be cognizant of potential current Medicaid eligibility of the preapplicant, and therefore perhaps more likely to be tempted by Medicaid fraud, two factors balance against such an occurrence. First, the providers in question here are those not enrolled currently as Medicaid providers. It is safe to assume that such providers are less familiar with the Medicaid requirements and are actually less likely to be able to predict which currently non-covered patients are actually of 'preapplicant' status and therefore 'good prospects' for fraud with subsequent Medicaid re-payment. Second, because indigent patients are a poor risk for re-payment of medical expenses to begin with, it is unlikely that a medical provider would make a habit of extending unneeded or unnecessarily expensive treatments to such patients in the hopes that, within the next three months, the patient would apply for and be approved for Medicaid, enabling the provider to collect on the expensive treatments. Similarly, collusion between the

preapplicant and a medical provider to defraud the Medicaid system is equally unlikely. The preapplicant is simply too ignorant of the system and their status within it, while the physician or other health care provider lacks sufficient motivation to engage in such fraud where the likelihood of remuneration from the government is uncertain." (*Carroll v. DeBuono, supra*, 998 F.Supp. at p. 197.)

The same result was reached in *Blanchard v. Forrest, supra,* 71 F.3d at pages 1168-1169, where the court held that "42 C.F.R. § 431.51(b)(1)(ii) . . . requires that a state plan must provide that a recipient may obtain Medicaid services from any provider that is 'willing to furnish [the services] to that particular recipient.' " Likewise in *Seittelman v. Sabol* (N.Y. 1995) 217 A.D.2d 523, affd. (1998) 91 N.Y.2d 618, 627, the court held that Medicaid beneficiaries must be reimbursed for qualifying medical expenses incurred during the retroactivity period, even if those expenses were obtained from a non-Medicaid provider. That court also rejected the asserted fraud-prevention rationale, reasoning that "[p]rior to the time of application, prospective recipients have no way of knowing that such a requirement is in effect and, therefore, no opportunity to limit their choice of medical providers to participants. The Regulation 'may not be applied with a literal rigidity that would effectively deny to eligible persons intended medical assistance.' " (*Id.* at p. 525.) The *Seittelman* court went on to hold that reimbursement could be denied for services obtained from non-Medicaid-enrolled providers during the evaluation period, but only if, upon application, the applicants were informed that they must seek medical services from Medicaid-enrolled providers from that point forward in order to be eligible for reimbursement. (*Id.* at pp. 525-526.)

The reasoning of these courts is sound. Prior to applying for Medi-Cal benefits, those later deemed entitled to state aid during the retroactivity period cannot reasonably be expected to know that they are limited in their choice of provider. Denying reimbursement to those who paid their non-Medi-Cal enrolled providers during the retroactivity period would violate the comparability requirement in much the same way as the Department's initial policy did. Those Medi-Cal recipients who paid their non-

31

Medi-Cal enrolled providers would receive fewer benefits than those who did not.[14]

However, we agree with the *Seittelman* court that the Department may limit reimbursement to enrolled providers during the evaluation period, *provided* that the Department gives notice to applicants at the time they apply for benefits that reimbursement for covered expenses will thereafter be made only for services obtained from enrolled providers.

Section 14019.3, as amended, provides that "[i]f a provider is not currently enrolled in the Medi-Cal program, the department shall assist in that enrollment. Enrollment in the Medi-Cal program may be made retroactive to the date the service was provided." (§ 14019.3, subd. (g).) The temporary or retroactive enrollment of a provider may in some cases enable the prompt reimbursement of covered expenses. However, as the Department's proposed implementation plan recognizes, DHS has no authority to compel a provider to enroll in Medi-Cal . If its efforts to encourage enrollment should be unsuccessful, prompt direct reimbursement to the beneficiary may be the only means by which the Department can fulfill its statutory obligations.[15]

### 5. Rate of reimbursement

Finally, the trial court's March 3, 2004 order addressed the rate at which the Department must provide reimbursement, and concluded as follows: "The compliance plan must fully reimburse Medi-Cal participants for their out-of-pocket expenses. As stated above, participants are entitled to seek reimbursement for expenses paid to non-Medi-Cal providers. In addition, the Medi-Cal recipients are entitled to full reimbursement, not simply reimbursement at the Medi-Cal rate for their covered services.

---

[14]  To the extent that amended section 14019.3 requires that a provider have been enrolled in Medi-Cal at the time services were provided to qualify for reimbursement, the statute conflicts with the comparability requirement and thus is invalid.

[15]  The proposed implementation plan submitted by the Department states, "If the non-enrolled provider will not cooperate, DHS cannot directly reimburse the beneficiary or force the provider to cooperate." As noted above, in addition to the force of this court's ruling in *Conlan I*, section 14019.3, subdivision (a) now expressly authorizes reimbursement directly to the beneficiary. Thus, the trial court properly refused to approve a plan excluding the possibility of direct reimbursement in such cases.

32

Case 3:08-cv-01273-PJH    Document 1-4    Filed 03/04/2008    Page 54 of 71






# ALAMEDA COUNTY MEDICAL CENTER
*Highland Campus • Fairmont Campus*
*John George Psychiatric Pavilion • Ambulatory Healthcare Services*

PATIENT
ACCOUNT NO:                    12/28/07

MEDICAL
RECORD NO:

AKA
PATIENT
NAME:     1009537729

## EMERGENCY DEPARTMENT
## CONDITIONS OF ADMISSION

DATE OF     01-30-78-91-3
BIRTH:
TERRELL ,EUGENE
UNIT 6/09/51   4 ENGLISH    NON

---

**I do not want to have an HIV test performed**

_____
(Signature)

---

**MEDICAL AND SURGICAL CONSENT:** Permission is hereby given for any medical or surgical treatment and diagnostic procedures, including x-ray examinations, laboratory procedures, **diagnostic tests, including HIV testing (unless declined),** injections, blood transfusions, anesthetics, operations,removal of tissue and disposal of tissue or other hospital services rendered the patient and under the general and special instruction of physicians performing professional services within the system of the Alameda County Health Care Services Agency.

**RELEASE OF INFORMATION:**
The undersigned agrees that, to the extent necessary to determine liability for payment and to obtain reimbursement, the hospital may disclose portions of the patient's record, including his/her medical records, to any person or corporation which is or may be liable, for all or any portion of the hospital's charges, including but not limited to insurance companies, health care service plans, or workers' compensation carriers. Special permission is needed to release this information where the patient is being treated for alcohol or drug abuse.

The hospital will obtain the patient's consent and his/her written authorization to release information, other than basic information, concerning the patient, except in those circumstances when the hospital is permitted or required by law to release information.

Upon inquiry, the hospital may make available to the public certain basic information about the patient, including name, address, age, sex general description of the reason for treatment (whether an injury, burn, poisoning, or other condition), general nature of the injury, burn, poisoning or other condition and general condition. If the patient or the patient's legal representative does not want such information to be released, he/she must make a written request for such information to be withheld. The patient or the patient's legal representative may obtain a separate form for this purpose upon request.

**CERTIFICATION FOR MEDICARE BENEFITS:**
I certify that the information given by me in applying for payment under title XVIII of the Social Security Act is correct. I authorize release of all records required to act on this request. I request that payment of authorized benefits be made on my behalf. I authorize the use of Medicare Lifetime Reserve days if needed.

**PERSONAL VALUABLES:**
It is understood and agreed that the hospital maintains a safe for the safekeeping of money and valuables, and the hospital shall not be liable for the loss or damage to any money, jewelry, documents, furs, fur coats and fur garments or other articles of unusual value and small size, unless placed therein, and shall not be liable for loss or damage to any other personal property, unless deposited with the hospital for safekeeping. The liability of the hospital for loss of any personal property which is deposited with the hospital for safekeeping is limited by statute to five hundred dollars ($500.00) unless a written receipt for a greater amount has been obtained from the hospital by the patient. (California Civil Code Section 1860.)

**FINANCIAL AGREEMENT:** The undersigned agrees, whether he signs as agent or as patient, that in consideration of the services to be rendered to the patient, he hereby individually obligates himself to pay the account of the hospital in accordance with the regular rates and terms of the hospital. Should the account be referred to an attorney for collection, the undersigned shall pay reasonable attorney's fee and collection expense. All delinquent accounts bear interest at the legal rate.

**INSURANCE ASSIGNMENT:** I hereby authorize payment directly and irrevocably to Alameda County Health Care Services Agency of the hospital and medical insurance benefits in my policy -- and otherwise payable to me but not to exceed the hospital's regular charges for this period of hospitalization. I understand I am financially responsible to the hospital for charges not covered by this agreement.

The undersigned certifies that he has read the foregoing, receiving a copy thereof, and is the patient, or is duly authorized by the patient as patient's general agent to execute the above and accept its terms.

| S I G N A T U R E | Witness: | Patient or Guardian's Sign: |
|---|---|---|
| | Witness: | Relationship: |
| | Date Signed: | Hour: |

Financial Responsibility Agreement by Person Other than the Patient, or the Patient's Legal Representative: I agree to accept responsibility for services rendered to the patient and to accept the terms of the Financial Agreement, Assignment of Insurance Benefits, and Health Care Services Plan Obligation Provisions above.

_____
(Financially Responsible Party)

☐ UNABLE TO SIGN - TREATMENT PERMIT (STATE REASON)

_____

_____

_____
                              Doctor's Signature

**Alameda Co Medical Center == Highland Campus Emergency Dept**
**1411 East 31st St., Oakland, CA 94602 == (510) 437-4559**

Pt Name: <u>Terrell, Eugene</u>
Pt Accnt: <u>1009537729</u>    MR#: <u>008078913</u>

Pt Name: <u>Terrell, Eugene</u>
MD ED: <u>English D.</u>
Res/PA/NP: <u>None</u>

DI Prntd: <u>12/28/2007 1839</u>
RN Eval: <u>Thao G.</u>

## AFTERCARE INSTRUCTIONS

We are pleased to have been able to provide you with emergency care. Please review these instructions when you return home in order to better understand your diagnosis and the necessary further treatment and precautions related to your condition. Your diagnoses/prescriptions today are:

Dx 1: <u>Pustular Folliculitis (Not Otherwise Specified)</u>
Dx 2: <u>Dyspepsia</u>
Dx 3: <u>Dermatitis, Unspecified Cause</u>
Rx 1: <u>Pepcid Tablets (famotidine)</u>
Dose/Conc: <u>20mg</u>                          Disp: <u>#30 tablets</u>
Freq/Rte: <u>1 tablet by mouth at bedtime</u>
Rx 2: <u>Clindamycin Capsules</u>
Dose/Conc: <u>150mg</u>                          Disp: <u>#40 capsules</u>
Freq/Rte: <u>2 capsules by mouth every 6 hours</u>
Rx Print Lctr <u>Emerg Dept</u>

## General Information on FOLLICULITIS, BACTERIAL

DESCRIPTION - A superficial or deep bacterial infection of hair follicles of the skin. This is contagious. It can involve the skin anywhere on the body, but usually affects the exposed areas of the arms, legs and beard area of the face.

### FREQUENT SIGNS AND SYMPTOMS

Pustules (small white blisters with pus inside) with the following characteristics:
* Pustules are yellow-white and surrounded by narrow red halos.
* Pustules are 1 mm to 2 mm in size; there may be few or many.
* Pustules discharge a blood-stained pus made from dead cells.
* Some pustules are pierced by hair; others may be adjacent to hair follicles.

### CAUSES
* Infection of the hair follicles with Staphylococcus bacteria, usually after minor skin injury. Infection spreads to other parts of the body by fingernails, frequently from Staphylococcus in the nose.
* Infection with Pseudomonas bacteria following the use of contaminated hot tubs or spas. This is rare but increasing.

### RISK INCREASES WITH
* Recent illness such as a nasal infection.
* Diabetes.
* Eczema or dermatitis.
* Crowded or unsanitary living conditions.
* Inflammation or chronic skin abrasion (tight clothing or chronic rubbing).
* Hot tub exposure.

### PREVENTIVE MEASURES
* Keep skin clean. Scrub skin twice daily with an antibacterial soap. Use separate towels and washcloths.
* Avoid hot, humid environments, which foster bacterial growth.

### EXPECTED OUTCOMES
* Without treatment, an individual pustule heals in 7 days but as some heal, new ones appear and boils or deep skin infections

**Alameda Co Medical Center == Highland Campus Emergency Dept**   Pt Name: <u>Terrell, Eugene</u>
**1411 East 31st St., Oakland, CA 94602 == (510) 437-4559**   Pt Accnt: <u>1009537729</u>   MR#: <u>008078913</u>

may develop.
* Treatment will shorten the course of the infection. Healing should be complete in 2 weeks. Recurrence is common.

POSSIBLE COMPLICATIONS - The infection may enter the bloodstream and spread to other body parts.

GENERAL MEASURES
* Diagnosis is usually determined by presence of the skin lesion; a culture of fluid from the pustule may be done.
* Treatment consists of supportive care of the skin and topical medication.
* Don't scratch pustules. The germs that cause them can be transferred from under the fingernails to other parts of the body.
* Use warm-water soaks to relieve itching and hasten healing.
* Clean area with antibacterial soap.
* Avoid use of oils on the skin.
* If you shave, change razor blades daily.
* Shampoo daily if lesions are on scalp.

MEDICATIONS
* If there are only a few pustules, you may use non-prescription topical antibiotics, such as bacitracin, Mycitracin or neomycin.
  Apply and gently massage a small amount into the affected areas 3 or 4 times a day. Use only the small amount needed to
  cover; larger quantities don't help.
* If there are many pustules, injections or oral antibiotics, such as erythromycin or dicloxacillin may be prescribed.

ACTIVITY - Resume your normal activities as soon as symptoms improve.

DIET - No special diet.

*SEEK IMMEDIATE MEDICAL ATTENTION IF*
* The pustules spread, despite treatment.
* Fever occurs.
* Ankles swell.
* You develop a boil or signs of spreading infection.
* Symptoms of bacterial folliculitis recur after treatment.

**General Information on INDIGESTION (Dyspepsia)**

DESCRIPTION - Vague chest or abdominal discomfort with no apparent organic cause that occurs during or soon after eating or
  drinking.

FREQUENT SIGNS AND SYMPTOMS
* Mild nausea.
* Heartburn.
* Upper abdominal pain.
* Gas or belching.
* Bloated or full feeling.
* Acid taste.

CAUSES - Symptoms seem related to eating, drinking, or swallowing air while talking or chewing gum. They occur most often
  with emotional upset while eating; excessive smoking; constipation; eating improperly cooked food; eating food with a high fat
  content; poor digestion of gas-forming foods such as beans, cucumbers, cabbage, turnips and onions; food allergy; or
  overindulgence in alcohol.

Alameda Co Medical Center == Highland Campus Emergency Dept     Pt Name: Terrell, Eugene
1411 East 31st St., Oakland, CA 94602 == (510) 437-4559     Pt Accnt: 1009537729     MR#: 008078913

RISK INCREASES WITH
* Stress.
* Smoking.
* Excess alcohol consumption.
* Use of drugs that may irritate the stomach.
* Fatigue or overwork

PREVENTIVE MEASURES
* Avoid foods you don't digest well, including carbonated beverages.
* Don't smoke.
* Relax after meals.
* Avoid emotional situations during meals.
* Don't eat fast.
* Persistent symptoms can indicate disease in the digestive tract or other body parts. Occasionally, symptoms occur in patients
  with no apparent disease. This indicates an abnormal function in a normal part of the body.

EXPECTED OUTCOMES - Symptoms can be controlled with treatment, but recurrence is likely.

POSSIBLE COMPLICATIONS - Signs of a heart attack or serious disease of the esophagus or stomach can mimic indigestion,
causing the serious disorder to be ignored.

GENERAL MEASURES
* In chronic cases, medical tests may include X-rays of the upper digestive tract and gastroscopy (visual examination of the
  inside of the stomach by means of a gastroscope, an optical instrument with a lighted tip).
Treatment and prevention are similar:
* Allow time for leisurely meals. Chew food carefully and thoroughly. Avoid conflicts during meals.
* Don't smoke immediately before a meal.
* Avoid excitement or exercise immediately after a meal.
* Avoid situations than make you swallow air, such as chewing gum.
* Avoid tight clothing.
* Observe episodes of indigestion for changes in symptoms. If character, timing, frequency or severity changes, a more serious
  disorder may be responsible. These include heartburn from irritation of the lower esophagus, gallbladder disease, ulcers or
  stomach cancer.

MEDICATIONS
* For minor discomfort, you may use non-prescription antacids.
* For serious discomfort, H-2 blockers, antispasmodics or tranquilizers to relieve tension may be prescribed.

ACTIVITY - No restrictions. Regular exercise program is encouraged.

DIET - No special diet. Avoid foods, especially those listed under Causes, if they cause discomfort.

*SEEK IMMEDIATE MEDICAL ATTENTION IF* .
* The pattern of indigestion symptoms changes markedly.
* Any of the following occur:
  - Vomiting, weight loss or appetite loss.
  - Black, tarry stool or vomiting of blood.
  - Fever.
  - Severe pain in the upper right abdomen.
  - Discomfort that continues unrelated to eating or chewing gum.
* Indigestion is accompanied by:
  - Shortness of breath.

Alameda Co Medical Center == Highland Campus Emergency Dept
1411 East 31st St., Oakland, CA 94602 == (510) 437-4559

Pt Name: Terrell, Eugene
Pt Accnt: 1009537729    MR#: 008078913

- Sweating.
- Pain radiating to the jaw, neck or arm.

**WARNING**: A HEART ATTACK OR SERIOUS DISEASE OF THE STOMACH OR ESOPHAGUS MAY LOOK LIKE
INDIGESTION AND THEREFORE GO UNNOTICED. THIS IS MORE LIKELY TO OCCUR IN PEOPLE WHO:
1. have had previous heart or lung problems,
2. smoke,
3. have high blood pressure, high cholesterol or diabetes,
4. have other family members who have had heart attacks or
5. are over 50 years old.

## General Information on DERMATITIS, ATOPIC

DESCRIPTION - A chronic inflammatory disease of the skin that is often associated with other allergic disorders that affect the
respiratory system, such as asthma or hay fever.

FREQUENT SIGNS AND SYMPTOMS
* Itching rash in areas where heat and moisture are retained, such as skin creases of elbows, knees, neck, face, hands, feet,
  groin, genitals and around the anus.
* Dry, thickened skin in affected areas.
* Uncontrolled scratching (frequently unconscious).
* Chronic fatigue from loss of sleep due to severe itching.

CAUSES - Unknown, but probably inherited and probably related to immune-system overactivity.

RISK INCREASES WITH
* Hay fever or asthma.
* Food allergy.
* Family history of atopic dermatitis or other allergic disorders.
* Stress. The rash and itching increase during stressful periods.
* Use of immunosuppressive drugs.
* Irritating clothes and chemicals.

PREVENTIVE MEASURES
* Decrease stress if possible.
* Avoid agents that cause irritation (wool, perfumes, fabric softeners, harsh soaps, etc.).
* Minimize sweating.
* Lukewarm, not hot baths.
* Lubricate skin frequently.

EXPECTED OUTCOMES - Unpredictable. Flare-ups and remissions may occur throughout life.

POSSIBLE COMPLICATIONS
* Secondary bacterial infection in the affected area.
* Increased susceptibility to adverse drug reactions.
* Decreased resistance to fungal and viral infections.
* Permanent scarring from scratching.
* Cataracts are more common in people with atopic dermatitis.
* Herpes simplex infections are more severe in people with atopic dermatitis.

Alameda Co Medical Center == Highland Campus Emergency Dept    Pt Name: Tirrell, Eugene
1411 East 31st St., Oakland, CA 94602 == (510) 437-4559    Pt Accnt: 1009537729    MR#: 008078913

GENERAL MEASURES
* Diagnosis is usually made by physical findings.
* Effective treatment involves eliminating allergens, avoiding irritants and other precipitating factors and relieving itching and inflammation.
* Use cool-water soaks for crusting, oozing lesions. These decrease itching and remove crusts.
* Bathe in cool to warm water with cleansing agents other than soap.
* Wear loose-fitting, cotton clothing (avoid wool and synthetics).
* Avoid fabric softeners and anti-static laundry products.
* Use petroleum, or alpha-hydroxy containing lanolin-based ointments after bathing.
* Reduce stress in your life, if possible.

MEDICATIONS
* To relieve minor itching, use non-prescription topical steroids or coal-tar preparations.
* For severe itching, you may be prescribed:
  - More potent topical steroids.
  - Oral cortisone drugs (rarely, and for short periods only).
  - Antihistamines or mild tranquilizers.
  - Lubricating ointments for the hands.
  - Antibiotics (sometimes) to fight secondary infections.

ACTIVITY - No restrictions except to keep cool. Avoid prolonged exposure to heat.

DIET - An allergy diet may be necessary, if food allergy is suspected.

*SEEK IMMEDIATE MEDICAL ATTENTION IF*
* You or a family member has symptoms of atopic dermatitis.
* You develop fever or uncontrolled itching during a flare-up.

Follow-up 1 Date: Call Monday for 1st available appointment
  Follow-up 1: General Medicine Clinic (K6)                    F/U 1 Ph: (510) 437-8500
              1411 E. 31St Street
              Bldg K, 6Th Floor
              Oakland          CA    94602

This is an Alameda County Community Clinic for people who have little or no medical insurance. All take MediCare and MediCal. They will see CMSP patients in the same way that Highland does. No one is turned away because of inability to pay. Most offer Adult and Children's primary care, family planning, prenatal care, immunization, screening and treatment for TB, sexually transmitted diseases, HIV testing. Some have dental and podiatry services. The wait times for a first-time appointment to these clinics varies. Please call for eligibility.

A continuacion esta una lista de clinicas para las personas que tienen muy poco seguro medico o que carecen del mismo.Toda ellas aceptan Medicare y MediCal. Atenderan a los pacientes de "CMSP" de la misma manera que lo hace el Hospital Highland. No se rechaza a nadie por el hecho de que no pueda pagar. La mayoria ofrece servicios de atencion primaria para Adultos y Ninos, control de la natalidad, cuidado prenatal, immunizacion, examen y tratamiento para la TB (tuberculosis), enfermedades transmitidas sexualmente (venereas), pruebas de virus que causa SIDA (HIV). Algunas tienen servicio dental y de podiatria. El tiempo de espera para la primera cita en estas clinicas varia. Por favor llame para averiguar si usted califica para estos servicios.

Other Instr: _____
             _____
             _____

Alameda Co Medical Center = Highland Campus Emergency Dept
1411 East 31st St., Oakland, CA 94602 = (510) 437-4559

**Pt Name: Terrell, Eugene**
**DOB: 5/9/1951**

**Pt Accnt: 1009537729**
**MR#: 008078913**

## MEDICATION(S) REVIEW (Discharge)

MD ED: English D.
Res/PA/NP: None

RN Triage: Maclean, Jane R.N.
RN Dispo:

### Current Medications (Review)

| Medication | Dose | Route | Frequency | MD Review | Reviewer | Reviewed |
|---|---|---|---|---|---|---|
| Nexium | | | | Try Pepcid Instead | English, David K. M.D. | 12/28/2007 1839 |
| Anti Fungal Cream | | | | Keep Taking & Ask Your Doctor | English, David K. M.D. | 12/28/2007 1839 |

Above is a list of the prehospital medications which you said you were taking.
Read the last column (MD Review) for further medication instructions.

Below is a list of medications prescribed at this visit in the Emergency Department.

**Script / Rx**

Rx 1: Pepcid Tablets (famotidine)
Dose/Conc: 20mg
Freq/Rte: 1 tablet by mouth at bedtime

Rx 2: Clindamycin Capsules
Dose/Conc: 150mg
Freq/Rte: 2 capsules by mouth every 6 hours

As Petitioners point out, singling out a group of recipients for only partial payment, while other participants receive full payment, would violate the comparability provision of the Medicaid Act relied upon by the Court of Appeal."

In *Schott v. Olszewski* (6th Cir. 2005) 401 F.3d 682 (*Schott*), the Sixth Circuit held that Medicaid recipients are entitled to full reimbursement of their out of pocket expenses. Reviewing cases in which courts have held that recipients are entitled to reimbursement (including *Conlan I*), *Schott* observed that "all of the arguments that support permitting direct reimbursement in the first place also support reimbursement at the out-of-pocket rate. Singling out a group of recipients for partial payment and providing full reimbursement to others violates the comparability provision of the Medicaid Act in the same way that distinguishing between those who paid for their care and those whose bills remain unpaid violates the provision. Where some Medicaid recipients are forced to pay for a portion of their treatment out-of-pocket while others are required to pay nothing for their treatment, the recipients have not received medical assistance of equal value." (*Id.* at p. 692.) The *Schott* court went on, "The Medicaid program, like all public benefit programs, requires a careful balancing of costs and benefits. [Citation.] Both the financial integrity of the program and the need of individual recipients must be considered. Failure to reimburse recipients for all of their expenses, however, shifts the burden of spiraling health care costs onto those who can least afford it, which is inconsistent with the very purpose of the Medicaid program." (*Ibid.*) The court noted that if the state did not want to pay the higher costs, it had "the option of requiring that providers issue refunds to individuals who pay for services rendered during the retroactive coverage period and then seek payment from Medicaid at the reduced rate." (*Ibid.*)

The same result was reached in *Greenstein by Horowitz v. Bane, supra,* 833 F.Supp. 1054. There the court held that "In terms of purchasing power, plaintiffs are not being treated equally to other Medicaid recipients. When plaintiffs are allotted the same amount of money Medicaid provides to other recipients, but are forced to pay for treatment or services which are furnished to ordinary Medicaid recipients without charge,

33

plaintiffs have not received assistance equal in amount to the assistance received by these other recipients who pay nothing. As compared with other Medicaid recipients, plaintiffs' medical assistance has diminished in value." (*Id.* at pp. 1073-1074; see also *Lustig v. Blum, supra,* 80 A.D.2d 558 [full reimbursement required]; *Kurnik v. Dept. of Health & Rehab. Serv., supra,* 661 So.2d at p. 918 ["such person is entitled to be made whole for out-of-pocket expenditures made before eligibility is determined"]; *Cohen by Cohen v. Quern, supra,* 608 F.Supp. at p. 1332 [state Medicaid program must force providers who regularly participate in program to provide full refunds to beneficiaries for services obtained during the retroactivity period, and to accept reimbursement at Medicaid rates].)

However, in *Seittelman v. Sabol, supra,* 91 N.Y.2d 618, the court interpreted the comparability provision to require parity only in the dollar amount of reimbursement. The court reasoned, "If plaintiffs are reimbursed for out-of-pocket costs, the State will likely be required to pay more to applicants who received services from non-Medicaid-enrolled providers during the three-month preapplication period and who paid their bills, than to those who were treated by Medicaid-enrolled providers, since the latter would be entitled to reimbursement at no more than the Medicaid rate. Requiring the State to pay these out-of-pocket costs creates the very situation the [comparability] provision was designed to avoid—the receipt by one class of Medicaid recipients of a greater amount of reimbursement dollars than another solely because some recipients visited a different group of providers. Such a rule would contribute to the creation of 'two classes of Medicaid recipients' . . . ." (*Id.* at p. 628.) The court continued, "It must also be recognized that the Medicaid system is premised upon the idea that the State and Federal governments will provide financial assistance to those in need but only within certain defined and accepted financial parameters. Reimbursement of Medicaid recipients' out-of-pocket expenses, which may be considerably higher than the Medicaid rate negotiated or exacted from enrolled medical providers, would be inconsistent with this premise and, thus, could not have been within the legislative intent." (*Id.* at p. 629.)

34

Although the *Seittleman* court is in the minority on this issue, we find its reasoning more persuasive. The Medi-Cal system must balance the need to treat beneficiaries fairly and equally with the obligation of fiscal responsibility. The Department is obligated to provide the same level of benefits, but not to ensure that all beneficiaries are made whole. (See *King by King v. Sullivan* (D.R.I. 1991) 776 F.Supp. 645, 651-653.) Limiting reimbursement to the Medi-Cal approved rates does not treat applicants who have paid for covered services differently from those who have delayed their payment, since in both cases the amount of reimbursement will be the same and the beneficiary will be responsible for the excess. This system may "penalize" those who pay more than the covered amount, but that is the result of their having purchased from a more expensive provider rather than of any differentiation between Medi-Cal recipients.

## *C. Conclusion*

With the various issues concerning implementation of this court's prior decision resolved by the foregoing discussion, the Department should proceed to comply with the decision in *Conlan I* without further delay. Almost three years have elapsed since that decision was rendered, allowing far more time than should be necessary to permit orderly planning. More than eight years have elapsed since the petition in this case was filed and since some Medi-Cal beneficiaries incurred covered expenses to which they may be entitled to long-overdue reimbursement. Compliance may not await additional funding. By virtue of subdivision (j) of the amended section 14019.3, implementation may proceed "by a provider bulletin or similar notification, without any further regulatory action." Should any additional questions concerning compliance arise, they should be presented to and resolved by the trial court as expeditiously as possible.

# DISPOSITION

Treating the Department's appeal from the order of March 3, 2004, as a petition for a writ of mandate, the petition is denied. The trial court did not abuse its discretion in refusing to approve the Department's proposed implementation plan and notice of that plan. The Department shall, within 30 days of this opinion becoming final, submit to the

35

trial court a revised implementation plan and proposed notice in conformity with the trial court's order of March 3, 2004, as modified in conformity with this opinion.

_____
Pollak, J.

We concur:

_____
Corrigan, Acting P. J.

_____
Parrilli, J.

A106278

36

| | |
|---|---|
| Trial court: | Superior Court of the City and County of San Francisco |
| Trial judge: | Honorable James L. Warren |
| Counsel for respondents: | Sonal Ambegaokar<br>Barbara K. Frankel<br>NEIGHBORHOOD LEGAL SERVICES OF LOS ANGELES COUNTY<br><br>Michael D. Keys<br>BAY AREA LEGAL AID<br><br>Richard A. Rothschild<br>Robert D. Newman<br>Catherine Murphy<br>Kimberly Lewis<br>WESTERN CENTER ON LAW & POVERTY<br><br>Barbara Jones<br>Rochelle Bobroff<br>Michael Schuster<br>AARP as Amicus Curiae on behalf of respondents |
| Counsel for appellants: | Bill Lockyer, Attorney General<br>Douglas M. Press, Thomas R. Yanger, Teresa L. Stinson, Elizabeth Edwards, Deputy Attorneys General<br>San Francisco, CA |

A106278

37

# CALIFORNIA DEPARTMENT OF HEALTH SERVICES

*Hearing No.* **2003106214**

*In the Matter of Claimant(s):*

Sylvia Price
P.O. Box 1121
Clearlake, CA 95422

# DIRECTOR'S ALTERNATE DECISION

I exercise my authority to issue this Director's Alternate Decision as the decision in this matter. The Administrative Law Judge's proposed decision, which is enclosed, was not adopted and has no effect.

*for* Sandra Shewry
Director

Issue Date:   8/23/06

| | *State Hearing Record* | | |
|---|---|---|---|
| *Hearing Date:* | August 8, 2006 | *Release Date:* | **SEP 2 5 2006** |
| *Aid Pending:* | Not applicable | *Issue Codes:* | [540-1] [590-2] |
| *Agency:* | Lake County | *Agency Representative:* | Les Dieter |
| *Agency:* | | *Agency Representative:* | |
| *Authorized Rep. Organization:* | Drug Policy Alliance | *Authorized Rep:* | Tamar Todd |
| *SSN:* | | *SSN:* | |
| *AKA:* | | *AKA:* | |
| *Case Name:* | | *Language:* | |
| *LA District/Case:* | | *Companion Case:* | |

*Appeal Rights*

*You may ask for a rehearing of this decision by mailing a written request to the Rehearing Unit, 744 P Street, MS 19-37, Sacramento, CA 95814 within 30 days after you receive this decision. In your rehearing request, state the date you received this decision and why a rehearing should be granted. If you want to present additional evidence, describe the additional evidence and explain why it was not introduced before and how it would change the decision. You may contact Legal Services for assistance.*

*You may ask for judicial review of this decision by filing a petition in Superior Court under Code of Civil Procedure §1094.5 within one year after you receive this decision. You may file this petition without asking for a rehearing. No filing fees are required. You may be entitled to reasonable attorney's fees and costs if the Court renders a final decision in your favor. You may contact Legal Services for assistance.*

*This decision is protected by the confidentiality provisions of Welfare and Institutions Code §10850.*

## SUMMARY

Lake County should have allowed the cost of medical marijuana to meet the California Medical Assistance Program (Medi-Cal) beneficiary's share of cost for the Personal Care Services Program (PCSP). A claim for reimbursement of the share of cost she paid to her PCSP provider must be submitted under the procedures to be established by the Department of Health Services (DHS) under *Conlan* v. *Bontá* (2002) 102 Cal. App. 4ᵗʰ 745 (*Conlan*). It is DHS' position that the issue of reimbursement raised at a state hearing must be dismissed.

## HISTORY

On April 16, 2003 the claimant requested a state hearing contesting Lake County's determination that her share of cost for the Personal Care Services Program (PCSP) would be increased from zero to $429.43 per month. The hearing, held on May 30, 2003 resulted in a decision adopted by the Directors of DHS and the Department of Social Services (DSS) on July 14, 2003. The claimant petitioned the Sacramento County Superior Court and a Peremptory Writ of Mandate was issued on July 11, 2005. The Writ was implemented by a Decision Pursuant to Court Order, dated August 31, 2005, ordering a new hearing with full briefing on the issue of whether the cost of Petitioner's medical marijuana used pursuant to a physician's recommendation constituted a "bona fide" medical expense to be deducted from her income for the purpose of determining her share of cost for In-Home Supportive Services.

That hearing was conducted on February 21, 2006. The Director of DHS reviewed that decision, and being dissatisfied with it, ordered this further evidentiary hearing pursuant to Welfare and Institutions Code (W&IC) Section 10959 to resolve specific issues including, but not limited to: `

1. Whether and to what extent the claimant's expenses for the purchase of medical marijuana are consistent with the Compassionate Use Act of 1996 and the Medical Marijuana Program Act;

2. Whether the expenses should be taken into account when determining the claimant's In-Home Supportive Care (IHSS) share of cost;

3. What the Medi-Cal share of cost was for the months in question and whether use of the IHSS or the Medi-Cal share of cost would be most advantageous to the claimant.

4. What the amount of reimbursement, if any, should be made to the claimant for the months in question for excess out of pocket expenses for in home services.

## STATEMENT OF FACTS

The period of review for this decision is limited to May 2003 through and including April 2004 because it was undisputed that as of May 2004 the claimant had a zero share of cost Medi-Cal and PCSP.

It is noted that the claimant has received PCSP (a DHS program) and Medi-Cal from Lake County since April 1997, and has never received IHSS (a DSS program). During the period of time in question she had income that resulted in a share of cost (SOC). It is undisputed that she paid this SOC to her PCSP provider.

The following facts are also not disputed. The claimant has lupus, a seizure disorder, and reflex sympathetic dystrophy, and osteoporosis, all chronic conditions that result in severe and constant pain. In September 2000 her treating physician wrote a letter in which he stated that he had discussed the medical benefits and risks of cannabis use as a treatment for these conditions and if she chose to use cannabis therapeutically he would continue to treat her. The letter was signed by Craig McMillan, M.D., a second time on April 10, 2000 with a notation that the anticipated duration of the claimant's illness was "lifetime". The county then used the cost of marijuana the claimant purchased from her provider of PCSP as a deduction from her income to determine her share of cost for Medi-Cal and PCSP. There was never a dual share of cost issue because the claimant received only PCSP and not IHSS.

A Physician's Statement under Health and Safety Code (H&SC) §11362.5 was submitted at the hearing. Mike Hopkins, M.D., and the claimant both signed this statement, indicating that if the claimant continued to use cannabis therapeutically he would monitor her medical condition. He also stated that the use of medical cannabis was considered to be useful in treating chronic pain and seizures, both of which were conditions the claimant had, and that cannabis would be useful to her to alleviate her pain.

Starting on June 28, 2002 Lake County proposed to stop deducting the cost of marijuana effective August 1, 2002. The claimant filed a timely hearing request and received aid pending the hearing that was ultimately held on May 30, 2003, resulting in a denial of the claim, and indicating that the cost of the marijuana could not be used to reduce her income or share of cost.

Once the deduction for the medical marijuana was eliminated the claimant's share of cost rose to $429.43 for May 2003 and to $408.43 per month from June 2003 through December 2003, and then to $407.43 per month through April 2004. These figures were supplied by the county at the hearing.

Receipts were provided at the hearing showing that the claimant paid her caregiver $2,547 for medical marijuana from June 1 through December 30, 2003. The receipt for 2004 showed a total of $5,148 was paid, averaged to $429 per month or $1,716 for January through April 2004. The total amount for which the claimant seeks reimbursement is $4,263. The claimant's caregiver testified at the hearing that he has filed federal income tax returns showing income from his business of growing and supplying medical marijuana and that copies of the returns are available if needed to verify that he received payments as noted here.

Various arguments that have been raised in the prior proceedings are no longer at issue. The disparity between federal law treating marijuana as a controlled and illegal substance and California's Compassionate Use Act of 1996 and the Medical Marijuana Program Act has been decided and it is now established that DHS regards medical marijuana used consistent with the Compassionate Use Act of 1996 and the Medical Marijuana Program Act as a bona fide medical expense.

The county agreed that the claimant's use of marijuana is in accord with California laws and that she uses the marijuana supplied to her to alleviate pain from her various medical conditions.

There are two questions that remain. The first is whether the cost of the marijuana should be used as a deduction in the computation of the claimant's share of cost or whether it should be used as a bona fide medical expenses that should have been used to meet her share of cost for

Medi-Cal. The second question remaining is if the claimant is entitled to reimbursement for the costs she incurred when the medical marijuana was no longer allowed by the county as a deduction form her income, and if so, how she should be reimbursed.

## LAW

The CDHS issues Medi-Cal regulations and these regulations are found in Title 22, California Code of Regulations (CCR). All further references, unless otherwise noted, are from the CCR. (§50005)

All Medi-Cal eligibility determinations are to be completed following Medi-Cal rules. This includes Medi-Cal eligibility determinations for the In-Home Supportive Services (IHSS) and Personal Care Service Program recipients. (All County Welfare Director's Letter 04-27, August 30, 2004)

The Personal Care Services Program (PCSP) provides personal care services to eligible Medi-Cal beneficiaries pursuant to Welfare and Institutions Code §14132.95 and Title 22, California Code of Regulations and is subject to all other provisions of Medi-Cal statutes and regulations. The program is operated pursuant to Manual of Policies and Procedures (MPP) Division 30. (MPP §30-700.2)

Income exemptions and deductions are set forth in and refer to §§50523 through 50555.2. (§50519)   A deduction of $20 from the combined nonexempt unearned income of all aged, blind, or disabled (ABD) MN persons and the spouse or parents of these persons is required. (§50549.2(a)) Any unused portion of this $20 deduction is subtracted from the earned income of the ABD person, or that person's spouse or parents (§50549.2(b))

When a state has elected to participate in the MN program, it must determine income for aged, blind, or disabled individuals by deducting those amounts which would be deducted in determining eligibility under SSI. (42 CFR §435.831(b)(2).

The state must also deduct the highest amounts from income that would be deducted in determining eligibility for optimal state supplements if these supplements are paid to all individuals who are receiving SSI or who would be eligible for SSI except for their income. (42 CFR §435.831(b)(3))

Federal regulation also provides for deducting necessary medical and remedial services expenses that are recognized under State law but not included in the State plan, in order to secure income eligibility. (42 CFR §435.831(e)(2).

State law defines "share of cost" as the amount of costs of health care which a person or family…must incur prior to being certified by the department" (W&IC 14054)  State law also provides that "(o)nce the beneficiary has incurred expenses for Medicare and other health insurance deductibles or coinsurance charges and necessary medical and remedial services that are not subject to payment by a third party and which equal or exceed his or her share of cost, the individual is entitled to receive health services" under the Medi-Cal program. (W&IC §14005.9(c).

State law recognizes the medical use of marijuana. The Compassionate Use Act of 1996 allows persons to grow or possess marijuana for medical use when recommended by a physician. The Medical Marijuana Program Act clarifies the scope of the Compassionate Use Act of 1996 and imposes restrictions, such as limitations on the amount of marijuana a patient or qualified

primary caregiver may possess or cultivate. (Stats.2003, ch.758, §1(b)(1), (3); H&SC §11362.77.) It also provides that, "[n]othing in [the Medical Marijuana Program Act) shall require a governmental, private, or any other health insurance provider or health care service plan to be liable for any claim for reimbursement for the medical use of marijuana. (H&SC §11362.785(d)

In *Conlan,* supra, 102 Cal. App 4th 745, Medi-Cal beneficiaries sought writs seeking reimbursement for covered expenses they paid while their applications were pending and for amounts paid as copayments after eligibility was established. The Court of Appeal reversed the superior court's denial and ordered it to issue a writ of mandate directing DHS to adopt and implement procedures to ensure that Medi-Cal beneficiaries receive reimbursement to which they are entitled.

The court also discussed the role of the Administrative Law Judges (ALJ) in the cases before them and required the "ALJs to determine what amounts, if any, each of the petitioner's is entitled to recover, that the Department is obligated to pay, and either to order direct reimbursement... or to allow the Department a reasonable period of time in which to implement new procedures designed to effect such reimbursement." (*Conlan*, supra, 102 Cal. App. 4th 764)

## CONCLUSIONS

During the time in question, from May 2003 through April 2004, the claimant received PCSP with a share of cost that was met by her payment to the PCSP provider. In addition to this she also paid a total of $4263 for medical marijuana to her PCSP caregiver. This expense has been substantiated by receipts submitted at the hearing.

There is no provision for a deduction from the claimant's unearned income for medical expenses. The only relevant expense that can be used to compute the claimant's income for purposes of determining her share of cost is the $20 deduction from any income.

The cost of medical marijuana could have been used to meet the claimant's share of cost. When used consistent with the Compassionate Use Act of 1996 and Medical Marijuana Program Act, DHS considers medical marijuana a bona fide medical expense that can be applied to the share of cost. The question then becomes whether the claimant's use was consistent with these laws. The county agreed it was. Therefore, the county should have allowed the claimant's monthly marijuana expense to meet her share of cost so that she did not have to pay her PCSP provider for personal care services to meet this obligation. She is therefore entitled to reimbursement of the amount she paid her PCSP provider for personal care services for the months May 2003 through April 2004, up to but not exceeding the amount of her accumulated share of cost obligation for this period.

The usual way for a beneficiary to receive reimbursement for medical expenses that should have been, but were not, paid for by Medi-Cal, is for the provider of the service to bill Medi-Cal, receive payment, and then reimburse the claimant. However, the court in *Conlan*, supra, 102 Cal. App. 4th at pp. 757-758, found that this is not a viable method for reimbursement for expenses that should have been covered. It is anticipated that DHS will have reimbursement procedures in place by October 2006. Until that time it is the position of the DHS that state hearings in which reimbursement is found to be appropriate should be dismissed and the claimants advised to file a direct claim with DHS at the following address: